ADOLPHUS JACKSON STEWART v. NATION-WIDE CHECK
CORPORATION, A CORPORATION

No. 47

(Filed 30 July 1971)

1. **Libel and Slander §§ 9, 15— qualified privilege — affirmative defense**

   In a defamation action qualified privilege is an affirmative defense which must be specially pleaded, and the burden is on defendant to establish facts sufficient to support such plea.

2. **Libel and Slander § 9— qualified privilege — proof of malice**

   Where qualified privilege exists, plaintiff cannot recover absent actual malice, and the burden of proving malice rests on plaintiff.

3. **Libel and Slander § 2— false accusation of embezzlement**

   A false and unprivileged charge of the crime of embezzlement is actionable *per se.*

4. **Libel and Slander § 2— words actionable per se — presumptions**

   Defamatory charges which are actionable *per se* raise a *prima facie* presumption of malice and a conclusive presumption of legal injury and general damage, entitling plaintiff to recover nominal damages at least without specific allegations or proof of damages.

5. **Libel and Slander §16— words actionable per se — directed verdict**

   Ordinarily, the court may not direct a verdict for the defendant when the evidence tends to show the publication by the defendant's agent of false statements of and concerning the plaintiff which are actionable *per se.*

6. **Libel and Slander § 9— qualified privilege — question of law**

   Whether a communication is qualifiedly privileged is a question of law for the court and not for the jury, unless the circumstances of the publication are in dispute, when it is a mixed question of law and fact.

7. **Libel and Slander § 9— qualified privilege**

   Qualified privilege extends to communications on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right or interest.

8. **Libel and Slander § 10— qualified privilege — accusation of misappropriation of employer's funds**

   Statements made by defendant's agent to defendant's customer relating to an unreported payment of $100 by the customer to plaintiff to apply on the customer's debt to defendant were qualifiedly privileged; however, a statement by the agent that plaintiff "has misappropriated funds other than this amount" was not qualifiedly privileged.

Stewart v. Check Corp.

9. **Libel and Slander § 9— qualified privilege — statements to defamed person's relatives**

Generally, communications made in good faith and without malice by a third person to relatives of the person defamed on a subject in which the person communicating has an interest, or in reference to which he has a duty, are qualifiedly privileged if made to a relative having a corresponding interest or duty; the duty need not be legal but is sufficient if it is a moral or social duty.

10. **Libel and Slander § 10— qualified privilege — accusations of misappropriation of funds — statements to accused's relatives**

Statements made by defendant's agent to plaintiff's uncle and first cousin accusing plaintiff of the misappropriation of funds belonging to defendant were not qualifiedly privileged, since neither the uncle nor the cousin had any interest or duty with reference to the subject of the agent's statements.

11. **Libel and Slander § 16— punitive damages — proof of actual malice**

Proof of actual malice (as distinguished from imputed malice) is prerequisite to the recovery of punitive damages in a defamation action.

Justice MOORE did not participate in the consideration or decision of this case.

Justice HIGGINS concurs in result.

ON *certiorari,* granted on motion of plaintiff, to review the decision of the Court of Appeals reported in 9 N.C. App. 172, 175 S.E. 2d 615, docketed and argued in the Supreme Court as No. 62 at Fall Term 1970.

Plaintiff, a former employee of defendant, instituted this action to recover compensatory and punitive damages allegedly caused by defamatory statements made in July, 1968, by defendant's agent, John Gormley, which falsely accused plaintiff of embezzlement.

Defendant denied plaintiff's essential allegations; and, by way of further answer, pleaded factual matters alleged "as an accord and satisfaction as to any claim the plaintiff may have had against the defendant, and in mitigation of any damage to which the plaintiff may be entitled, the defendant denying that the plaintiff is entitled to any relief in this action."

Plaintiff replied to allegations of defendant's further answer.

The case came on for trial before Bryson, J., and a jury at the January 19, 1970 Schedule "B" Civil Session of Mecklenburg Superior Court.

The evidence offered by plaintiff, summarized except where quoted, tends to show the facts narrated below.

Defendant, a Maryland corporation, is engaged in the business of issuing money orders through various representatives in several States, including North Carolina. Those authorized to issue money orders in defendant's name are provided certain supplies, including money order forms presigned by defendant's president, and a type of check-writing machine that would cut a specific amount "into the money order." The authorized representative received a commission for each order.

Plaintiff was employed by defendant as a sales representative and service man. His duties included calling on those authorized by defendant to issue money orders, providing them with necessary supplies and advice, and on occasion collecting money owed by them to defendant. Plaintiff reported his activities to Mr. Don Clark, defendant's District Supervisor for North Carolina and Virginia.

Prior to July, 1968, one of defendant's representatives, Daughety Super Market in Kinston, was in arrears in its payments to defendant, having failed to make full remittance or account to defendant for money collected from issuing defendant's money orders. Plaintiff was instructed to go to Kinston and discuss the situation with Mr. Elwood T. Daughety, the operator of Daughety Super Market, and to collect the past due account. Sometime thereafter, John Gormley, an employee of defendant, was sent to North Carolina to investigate the activities of plaintiff, to ascertain "the whereabouts" of plaintiff, and to relieve him of his credentials and of defendant's valuable equipment and supplies in his possession.

Gormley arrived in Kinston on or about July 17, 1968. He contacted Mr. Daughety and advised him that he was there to check his books. A disagreement arose between Gormley and Daughety as to the amount in arrears, Daughety contending that he owed one hundred dollars less than the amount claimed by Gormley. Thereupon, Daughety exhibited a receipt signed by plaintiff showing a payment of one hundred dollars. Daughety testified: "As to what he said with reference to Jack Stewart after that, he said well, this still doesn't get Mr. Stewart off the hook because he has misappropriated funds other than this amount."

---

---

Plaintiff is the nephew of Mrs. I. A. McQueen, the oldest son of Mrs. McQueen's brother. Mrs. McQueen testified: "Our home has been his home so to speak. My address is 543 Vista Drive, Fayetteville, North Carolina. After Jack's mother died (1948), he came to live with us. He was seventeen at that time. As to how long he lived with me, he went in service in 1949 and I signed for him to go in and then when he returned from service he came back. In other words, our home was called his home in this respect." Plaintiff was not living with Mrs. McQueen in 1968 but was living in Charlotte. He had lived in Charlotte since August of 1956. However, he stayed with Mrs. McQueen when he was in the Fayetteville area and had permission to give her telephone number to anyone seeking to get in touch with him.

On or about July 17, 1968, Mrs. McQueen received a phone call from Gormley inquiring as to the whereabouts of her nephew. Gormley told her that he had to get in touch with plaintiff and asked if he might call back later. Gormley called back twenty or thirty minutes later. As to what was said in this telephone conversation, Mrs. McQueen testified: "I said, Mr. Gormley, what seems to be the problem that you are so anxious to get in touch with Jackie. I said, where is Mr. Clark? Don Clark I was referring to because I knew that Mr. Clark was Jackie's immediate supervisor and he told me that he was on vacation. So he informed me, I asked him should there be any problem and he said well, no and yes. I said well, can I take a message just for my own that I might pass on to Jackie should he come in. So he said well, he had orders from the executive vice-president of Nation-Wide Check Corporation to get in touch with Jackie as soon as possible. I said well, Mr. Gormley, can you not give me some information. You seemed so anxious and it is such an urgent thing. I said, what seems to be the problem? I said, are you trying to tell me that Jack has a financial problem with the company? He said yes ma'am, I am afraid so. I said, Dear Lord, what status could it be, thousands or hundreds. And he said hundred, Mrs. McQueen. I said, are you sure. He said yes ma'am. I said this doesn't sound like Jackie but I shall be delighted to give Jackie the message to contact you should he come in. He said, Mrs. McQueen, I'll have to see Jack by midnight in order to save his job. He had told me prior in the conversation, I have to see Jack in order to save his job and that is when I asked him could there be a money problem be-

cause he had orders, emphatically stated, he had orders from the executive vice-president, Mr. Al Robbins of Nation-Wide Check Corporation to contact Jackie at once."

On or about July 17, 1968, Claude M. Stewart, Jr., a nephew of Mrs. McQueen and first cousin of plaintiff, was spending a few days at the McQueen home while Stewart's wife was out of town. When Mrs. McQueen went out to get her hair fixed, she requested Stewart to stay at the house in case plaintiff or Gormley called so that he could take the message. When Gormley called, Stewart asked him if there was any message, explaining that he had been asked to stay there and answer the phone for that purpose. Stewart testified: "He (Gormley) said his home office had advised him not to bother trying to contact Jack anymore or any of his family. That they were going to put out an APB or state alert and have him picked up but that he was going to try to hold them off until noon . . . . " Stewart also testified that Gormley said: "(F)or all we know, Jack might be in Mexico now with the money."

On or about July 17, 1968, Gormley called the McQueen home and talked with I. A. McQueen, plaintiff's uncle by marriage. McQueen testified that Gormley said "it was urgent that he find Jack Stewart and that he had a man in Kinston who had receipts to prove that he had paid Jackie several thousand dollars that he was short. That it was urgent that he get ahold to him at once because he had thirty thousand dollars worth of negotiable funds with him and he didn't know what amount he might have spent of that."

On July 18, 1968, plaintiff saw Gormley in Fayetteville and accounted for all property belonging to defendant. He remained in the employment of defendant until discharged on or about November 11, 1968.

At the conclusion of plaintiff's evidence, defendant moved for a directed verdict and also for leave to amend its pleading so as to allege that the conversations in which Gormley allegedly made defamatory statements were "privileged conversations." The judge denied the motion for leave to amend as "unnecessary for a decision by the Court as to the merits" but allowed defendant's motion for a directed verdict. Judgment was entered which dismissed the action and taxed plaintiff with the costs.

Stewart v. Check Corp.

Upon plaintiff's appeal, the judgment was affirmed by the Court of Appeals.

*B. Kermit Caldwell for plaintiff appellant.*

*Lloyd C. Caudle and John G. Golding, by John G. Golding, for defendant appellee.*

BOBBITT, Chief Justice.

The question of law presented by defendant's motion for a directed verdict under Rule 50(a), G.S. 1A-1, is whether plaintiff's evidence was sufficient for submission to the jury. *Kelly v. Harvester Co.,* 278 N.C. 153, 157, 179 S.E. 2d 396, 398 (1971).

"On a motion by a defendant for a directed verdict in a jury case, the court must consider all the evidence in the light most favorable to the plaintiff and may grant the motion only if, *as a matter of law,* the evidence is insufficient to justify a verdict for the plaintiff." 5 Moore's Federal Practice, § 41.13(4) at 1155 (2d 1969). Accord: *Kelly v. Harvester Co., supra.*

[1, 2] In a defamation action qualified privilege is an affirmative defense. Ordinarily, it must be specially pleaded. *Bouligny, Inc. v. Steelworkers,* 270 N.C. 160, 173, 154 S.E. 2d 344, 356 (1967) ; Annot., 51 A.L.R. 2d 552, *567 et seq.* (1957). The burden is on defendant to establish facts sufficient to support this plea. Where qualified privilege exists, plaintiff cannot recover absent actual malice; and the burden of proving actual malice rests on plaintiff. *Ponder v. Cobb,* 257 N.C. 281, 126 S.E. 2d 67 (1962), and cases cited.

Defendant did not allege qualified privilege in its answer proper or in its further answer and defense. The trial judge denied defendant's motion for leave to amend. In the Court of Appeals, defendant again moved for leave to file an amendment to its pleading and allege qualified privilege. Under authority of Rule 20(c) of its Rules of Practice, the Court of Appeals allowed defendant's motion. Although the record before us does not contain such amendment, the decision of the Court of Appeals assumes qualified privilege was properly pleaded pursuant to its allowance of defendant's motion.

In affirming the *judgment* of the superior court, the Court of Appeals held: (1) The defamatory words attributed to Gormley were actionable *per se;* (2) plaintiff's evidence established that these alleged defamatory statements were qualifiedly privileged; and (3) that plaintiff offered no evidence of actual malice.

[3, 4] According to plaintiff's evidence, Gormley, defendant's agent, in conversations with Daughety and with plaintiff's relatives, made false statements which, in effect, charged plaintiff with the crime of embezzlement. A false and unprivileged charge of the crime of embezzlement is actionable *per se.* 50 Am. Jur. 2d *Libel and Slander* § 44 (1970); 53 C.J.S. *Libel and Slander* § 68 (1948); *Beck v. Bank,* 161 N.C. 201, 206, 76 S.E. 722, 724 (1912). Defamatory charges which are actionable *per se* raise a *prima facie* presumption of malice and a conclusive presumption of legal injury and general damage, entitling plaintiff to recover nominal damages at least without specific allegations or proof of damages. *Badame v. Lampke,* 242 N.C. 755, 89 S.E. 2d 466 (1955); *Kindley v. Privette,* 241 N.C. 140, 84 S.E. 2d 660 (1954); *Roth v. News Co.,* 217 N.C. 13, 6 S.E. 2d 882 (1940); *Flake v. News Co.,* 212 N.C. 780, 195 S.E. 55 (1938); *Broadway v. Cope,* 208 N.C. 85, 179 S.E. 452 (1935).

[5] Ordinarily, the court may not direct a verdict for the defendant when the evidence tends to show the publication by the defendant's agent of false statements of and concerning the plaintiff which are actionable *per se.* See *Gillis v. Tea Co.,* 223 N.C. 470, 27 S.E. 2d 283, 150 A.L.R. 1330 (1943), where it was held that such evidence required the denial of the defendant's motion for judgment of involuntary nonsuit under the (repealed) statute formerly codified as G.S. 1-183.

[6] "Whether the occasion is privileged is a question of law for the court, subject to review, and not for the jury, unless the circumstances of the publication are in dispute, when it is a mixed question of law and fact." *Ramsey v. Cheek,* 109 N.C. 270, 13 S.E. 775 (1891). Accord, 50 Am. Jur. 2d *Libel and Slander* § 200; *Hartsfield v. Hines,* 200 N.C. 356, 361, 157 S.E. 16, 19 (1931).

On this appeal, decision turns upon whether plaintiff's evidence discloses the defamatory statements, although action-

able *per se,* were qualifiedly privileged. The Court of Appeals answered, "Yes." We take a different view and reverse.

"Conditional or qualified privilege is based on public policy. It does not change the actionable quality of the words published, but merely rebuts the inference of malice that is imputed in the absence of privilege, and makes a showing of falsity and actual malice essential to the right of recovery.

[7] "A qualified or conditionally privileged communication is one made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right, or interest. The essential elements thereof are of good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only. The privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty." 50 Am. Jur. 2d *Libel and Slander* § 195 (1970). Accord: 53 C.J.S. *Libel and Slander* § 89 (1948) ; *Hartsfield v. Hines, supra* at 361, 157 S.E. at 19.

[8] Both Gormley and Daughety had an interest and duty with reference to the status of Daughety's indebtedness to defendant. Hence, statements by Gormley relating to an unreported payment of one hundred dollars by Daughety to plaintiff to apply on Daughety's debt to defendant were qualifiedly privileged. However, Daughety had no interest or duty with reference to what plaintiff did with funds other than those collected from him. Hence, the statement made by Gormley, according to Daughety's testimony, that "this still doesn't get Mr. Stewart off the hook because he has misappropriated funds other than this amount," was not qualifiedly privileged.

There remains for consideration the statements which, according to plaintiff's evidence, were made by Gormley to the McQueens, aunt and uncle of plaintiff, and to Claude M. Stewart, Jr., plaintiff's first cousin.

[9] Generally, communications made by a third person to relatives of the person defamed on a subject in which the person communicating has an interest, or in reference to which he has

Stewart v. Check Corp.

a duty, are qualifiedly privileged if made to a relative having a corresponding interest or duty. The duty need not be legal. It is sufficient if it is a moral or social duty. This is true as long as the communications are made in good faith and without malice. 50 Am. Jur. 2d *Libel and Slander* §§ 203-204 (1970); Annot., "Libel and Slander; Defamation of one relative to another by person not related to either, as subject of qualified privilege," 25 A.L.R. 2d § 1388 (1952). Whether this general rule applies depends upon various factors, *e.g.*, the age of the person allegedly defamed, his place of residence, his relationship to the person(s) to whom the communication is made, such person's responsibility, if any, for him, etc. Suffice to say, the general rule has no application to the factual situation now under consideration.

Plaintiff went to live with his aunt and uncle in 1948. He was then seventeen years old. He did not live with them in July, 1968, but stayed overnight in their home when he was in the Fayetteville area. In July, 1968, he was approximately thirty-seven years old, married and lived in Charlotte.

It may be conceded that Gormley's statement to Mrs. McQueen, in reply to her questions, that plaintiff had a financial problem with defendant involving one hundred dollars, did not charge plaintiff with the crime of embezzlement.

In Mrs. McQueen's absence, Claude M. Stewart, Jr., plaintiff's cousin, answered the phone simply to take a message. Gormley's statements went beyond those necessary to advise Stewart that plaintiff should contact him immediately. According to Stewart, Gormley stated that "his home office had advised him not to bother trying to contact Jack anymore. . . . That they were going to put out an APB or state alert and have him picked up . . . . " This, together with his other statement that "for all we know, Jack might be in Mexico now with the money," could reasonably be interpreted as accusing plaintiff of misappropriating funds belonging to defendant.

Gormley's statement to Mr. McQueen, "that it was urgent that he find Jack Stewart and that he had a man in Kinston who had receipts to prove that he had paid Jackie several thousand dollars that he was short. That it was urgent that he get ahold to him at once because he had thirty thousand dollars worth of negotiable funds with him and he didn't know what

Stewart v. Check Corp.

amount he might have spent of that," substantially charged plaintiff with the misappropriation of defendant's funds. There is no evidence that McQueen made any inquiry as to why Gormley wanted to contact plaintiff or that he persisted in questioning him in any manner.

[10] In summary, we hold that plaintiff's evidence refutes rather than supports any claim that either Claude M. Stewart, Jr., or Mr. McQueen had any interest or duty with reference to the subject of Gormley's statements which would render qualifiedly privileged Gormley's accusations that plaintiff had misappropriated funds belonging to defendant.

[11] Since plaintiff's evidence does *not* establish that the defamatory statements attributed to Gormley in his conversations with Daughety and with the relatives of plaintiff were qualifiedly privileged, proof of actual malice was unnecessary to withstand defendant's motion for a directed verdict. However, it is noted that proof of actual malice (as distinguished from imputed malice) is prerequisite to the recovery of punitive damages. *Roth v. News Co., supra* at 16, 6 S.E. 2d at 887, and cases cited; *Bouligny, Inc. v. Steelworkers, supra* at 170, 154 S.E. 2d at 354; *Woody v. Broadcasting Co.,* 272 N.C. 459, 463, 158 S.E. 2d 578, 581-582 (1968).

Reversed.

Justice MOORE did not participate in the consideration or decision of this case.

Justice HIGGINS concurs in result.