David I. SMITH, Plaintiff,

v.

Robert McDONALD, Defendant.

Civ. A. No. C–81–475–G.

United States District Court,
M.D. North Carolina,
Greensboro Division.

April 28, 1983.

B.F. Wood, Latham, Wood & Abernathy, Graham, N.C., for plaintiff.

Bruce J. Ennis and Geoffrey P. Miller, Ennis, Friedman, Bersoff & Ewing, Washington, D.C., McNeill Smith and H. Miles Foy, III, Smith, Moore, Smith, Schell & Hunter, Greensboro, N.C., for defendant.

## MEMORANDUM OPINION

BULLOCK, District Judge.

David I. Smith, a citizen of the State of North Carolina, filed this action for libel in the North Carolina General Court of Justice, Superior Court Division of Alamance County, on July 24, 1981. The complaint alleges that, following the general election of 1980, Smith applied for the position of United States Attorney for the Middle District of North Carolina and that he was being "seriously considered" for such position by the relevant authorities. Smith's cause of action is based upon two letters written by the Defendant, Robert McDonald, and sent by him to the President of the United States, Ronald Reagan, urging the President not to appoint Smith as United States Attorney. Copies of the letters were also allegedly mailed by McDonald to several members of Congress, to Edwin Meese, Chief Counselor to the President and Chairman of the Transition Team, and to William Webster, Director of the Federal Bureau of Investigation.

The complaint states that McDonald composed the letters "wilfully and maliciously and with evil and wicked intent." Smith also alleges that the letters contain:

> [F]alse, slanderous, libelous, inflamatory [sic] and derogatory statements and allegations of and concerning the plaintiff ... that the defendant knew ... were false and untrue and that same were made with the specific and malicious intent to harm the plaintiff in his personal life and in his profession as an attorney ... and for the further express and malicious purpose of harming and damaging the plaintiff's application and chances to be appointed as the United States Attorney for the Middle District of North Carolina.

Complaint, ¶ 5.

Smith was not selected by the President to serve as U.S. Attorney and thereafter commenced this action in state court. On August 25, 1981, McDonald petitioned for removal to this court pursuant to 28 U.S.C. § 1441. In the petition McDonald argued that he was a citizen of the Commonwealth

of Virginia on the date this action was filed and that, therefore, the court had original diversity jurisdiction over the subject matter. *See* 28 U.S.C. § 1332.

On September 24, 1981, McDonald moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief could be granted. The motion was based upon McDonald's contention that communications made to an appointing authority regarding the character and qualifications of a candidate for public office are entitled to an absolute privilege under the common law. On October 2, 1981, Smith filed a motion to remand the case to state court on the grounds that McDonald was a citizen of the state of North Carolina on the date the action was commenced. Both McDonald's motion to dismiss and Smith's motion to remand were denied by the Honorable Eugene A. Gordon, United States District Judge for the Middle District of North Carolina, by order dated March 19, 1982.

The matter currently before the court is McDonald's motion for judgment on the pleadings, Fed.R.Civ.P. 12(c), filed along with his answer on August 9, 1982. The crux of McDonald's argument rests upon his contention that the conduct with which he is charged by Smith is absolutely privileged under the "petition" clause of the first amendment of the Constitution of the United States. Restricting its consideration solely to the constitutional issues addressed by the parties,[1] the court determines that McDonald is entitled to only a qualified privilege under the first amendment and that his motion for judgment on the pleadings must therefore be denied.

## I. COMMON LAW ELEMENTS OF AN ACTION FOR LIBEL

In order to consider McDonald's claim of constitutionally-based "privilege," the court finds it necessary to review the elements of an action for libel in conjunction with the common law defense of "privilege." For guidance, the court turns to decisions by the North Carolina courts.

A libel, as applied to individuals, is a malicious publication expressed either in printing or writing or by sign or picture tending to blacken the memory of one dead or the reputation of one alive and to expose him to public hatred, contempt, or ridicule. *Davis v. Askin's Retail Stores, Inc.,* 211 N.C. 551, 191 S.E. 33, 34 (1937). To constitute a "publication" of allegedly defamatory matter, it is necessary that some third person understand the defamatory matter. *Wright v. Commercial Credit Co.,* 212 N.C. 87, 192 S.E. 844, 845 (1937). Letters written to public officials commenting on the fitness of subordinates have been found to constitute "publication" for purposes of maintaining an action for libel. *Angel v. Ward,* 43 N.C.App. 288, 258 S.E.2d 788 (1979); *Ponder v. Cobb,* 257 N.C. 281, 126 S.E.2d 67 (1962); *Alexander v. Vann,* 180 N.C. 187, 104 S.E. 360 (1920); *Ramsey v. Cheek,* 109 N.C. 270, 13 S.E. 775 (1891). *Also see White v. Nicholls,* 44 U.S. (3 How.) 266, 11 L.Ed. 591 (1845).

Defamatory matter, written or printed, may be libelous and actionable *per se,* without any allegation of special damages, if it tends to expose the plaintiff to "public hatred, contempt, ridicule, aversion, or disgrace and to induce an evil opinion of him in the minds of right thinking persons ...." *Flake v. Greensboro News Co.,* 212 N.C. 780, 195 S.E. 55, 60 (1938).[2] To be

1. This case apparently involves a North Carolina plaintiff who sought a Presidential appointment to a job in North Carolina and a Virginia defendant who allegedly composed libelous letters while living in North Carolina. The letters were then sent to Washington, D.C., to the Office of the President, other executive branch officials, a Congressman from California, and Congressmen from North Carolina. Hidden somewhere within this scrambled factual scenario is a troublesome question concerning

choice of law. The court specifically does not now decide that question since it has not yet been fully developed factually nor briefed by the parties. However, resolution of the conflicts issue is mooted to the extent the court finds that the elements Smith must establish to recover are dictated by the first amendment.

2. Under North Carolina law, there are two other classes of libel besides libel *per se.* The first of these includes publications susceptible of

libelous *per se,* defamatory words must be susceptible of but one meaning and of such nature that the court can presume as a matter of law that they tend to disgrace and degrade the party. Publications are to be taken in the sense which is most obvious and natural and according to the ideas they are calculated to convey.[3]

 Under the common law, privilege is a question of law to be determined by the courts. *Stewart v. Nation-Wide Check Corp.,* 279 N.C. 278, 182 S.E.2d 410, 414 (1971); *Hartsfield v. Harvey C. Hines Co.,* 200 N.C. 356, 157 S.E. 16, 19 (1931); *Gattis v. Kilgo,* 140 N.C. 106, 52 S.E. 249, 250 (1905). Privilege is determined primarily by the occasion and circumstances under which the statement is made. ·*Stewart v. Nation-Wide Check Corp.,* 182 S.E.2d at 415. Privileged communications may be either "absolutely privileged" or "qualifiedly privileged." *Ramsey v. Cheek,* 109 N.C. 270, 13 S.E. 775 (1891).

 In the state of North Carolina, when a court determines that a publication is actionable *per se,* the law presumes malice and the burden is on the defendant to show that his charge is true. But in a case of absolute privilege no action can be maintained, even though it can be shown that the charge was both false and malicious. In a case of qualified privilege, an action may be maintained if the plaintiff can prove both the falsity of the charge and that it was made with actual malice. *Hartsfield v. Harvey C. Hines Co.,* 157 S.E. at 19; *Newberry v. Willis,* 195 N.C. 302, 142 S.E. 10 (1928); *Bird v. Hudson,* 113 N.C. 203, 18 S.E. 209, 210 (1893).

Absolute privilege has been confined "by general agreement" to only those situations "where there is an obvious policy in favor of permitting complete freedom of expression, without any inquiry as to the defendant's motives." PROSSER, LAW OF TORTS, § 114 (4th ed. 1971). In the state of North Carolina, absolute privilege has been limited to "words used in debate in [C]ongress and the state legislatures, reports of military or other officers to their superiors in the line of duty, everything said by a judge on the bench, by a witness in the box, and the like." *Ramsey v. Cheek,* 13 S.E. at 775. *Also see Bailey v. McGill,* 247 N.C. 286, 100 S.E.2d 860, 866 (1957); *Jarman v. Offutt,* 239 N.C. 468, 80 S.E.2d 248, 251 (1954); *Mitchell v. Bailey,* 222 N.C. 757, 23 S.E.2d 829 (1943). The privilege attending communications made in the course of judicial proceedings has been extended to communications in an administrative proceeding where the administrative officer or agency is acting in a judicial or quasi-judicial function. *Angel v. Ward,* 43 N.C.App. 288, 258 S.E.2d 788, 792 (1979); *Mazzucco v. Board of Medical Examiners,* 31 N.C.App. 47, 228 S.E.2d 529, 532, *appeal dismissed,* 291 N.C. 323, 230 S.E.2d 676 (1976).

 Under the common law of North Carolina, communications to public officials regarding the fitness of subordinates for public office are entitled to only a qualified privilege. *Angel v. Ward,* 43 N.C.App. 288, 258 S.E.2d 788 (1979); *Dellinger v. Belk,* 34 N.C.App. 488, 238 S.E.2d 788 (1977), *dis. rev. denied,* 294 N.C. 182, 241 S.E.2d 517 (1978); *Ponder v. Cobb,* 257 N.C. 281, 126 S.E.2d 67

---

two interpretations, one of which is defamatory and the other not. The second class, termed libel *per quod,* involves publications not obviously defamatory but when considered with innuendo, colloquium, and explanatory circumstances becomes libelous. In an action upon the first class it is for the jury to determine whether the publication was defamatory and was so understood by those who saw it. In publications which are libelous *per quod,* the innuendo and special damages must be alleged and proved. *Arnold v. Sharpe,* 296 N.C. 533, 251 S.E.2d 452, 455 (1979).

3. *Flake v. Greensboro News Co.,* 212 N.C. 780, 195 S.E. 55, 60 (1938). In *Flake,* the Supreme Court of North Carolina identified the cases where publications had been held libelous *per se* by North Carolina courts. "The decisions in this jurisdiction, as well as others, clearly establish that a publication is libelous per se, or actionable per se, if when considered alone without innuendo: (1) It charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to ridicule, contempt, or disgrace; or (4) it tends to impeach one in his trade or profession." *Id.*

(1962); *Alexander v. Vann,* 180 N.C. 187, 104 S.E. 360 (1920); *Ramsey v. Cheek,* 109 N.C. 270, 13 S.E. 775 (1891). In such cases, the plaintiff can therefore recover only if he can prove the malicious intent of the defendant and the falsity of the statements. *Angel v. Ward,* 258 S.E.2d at 791; *Dellinger v. Belk,* 238 S.E.2d at 789; *Ponder v. Cobb,* 126 S.E.2d at 80; *Alexander v. Vann,* 104 S.E. at 361; *Ramsey v. Cheek,* 13 S.E. at 775.

■■■ Were the instant case governed solely by the common law, McDonald would be clearly entitled to only a qualified privilege.

## II. CONSTITUTIONAL ISSUES

The first amendment to the United States Constitution states that: "Congress shall make no law ... abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S.C.A. Const.Amend. I. The first amendment thus expressly protects the right of the people to petition the government for a redress of grievances. That right, the Supreme Court has stated, is "among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers v. Illinois State Bar Association,* 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967).

McDonald contends that he is entitled to an absolute privilege under the "petition" clause based primarily upon two Supreme Court decisions interpreting the relationship between that clause and the Sherman Act. 15 U.S.C. § 1, *et seq. See Eastern Railroad President's Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Before directly addressing the argument advanced by McDonald, the court finds it necessary to consider additional Supreme Court precedents it deems relevant.

Prior to the enactment of the fourteenth amendment to the Constitution, the first eight amendments clearly did not apply to the states. *Barron v. Baltimore,* 32 U.S. (7 Peters) 242, 8 L.Ed. 672 (1833). As late as 1875 the Supreme Court concluded that the first amendment "like the other amendments proposed and adopted at the same time, was not intended to limit the powers of the state government in respect to their own citizens, but to operate upon the National government alone." *United States v. Cruikshank,* 92 U.S. (II Otto) 542, 552, 23 L.Ed. 588 (1875).

■■■ Despite this historical precedent, by 1925 the Supreme Court determined that the first amendment freedoms of speech and the press were among the fundamental personal rights and liberties protected by the due process clause of the fourteenth amendment from impairment by the states. *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 629, 69 L.Ed. 1138 (1925). Under current constitutional precedent "[t]here is no longer any doubt" that the freedoms guaranteed by the first and fourteenth amendments are secured to all persons against abridgment by the states. *NAACP v. Button,* 371 U.S. 415, 430, 83 S.Ct. 328, 336, 9 L.Ed.2d 405 (1961); *also see Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).[4]

4. The court is unable to determine whether the first amendment applies to the states under the theory of substantive due process, *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905); *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 629, 69 L.Ed. 1138 (1925), or because the framers of the fourteenth amendment, "intended ... to make the Bill of Rights, applicable to the states." *Adamson v. California,* 332 U.S. 46, 71–72, 67 S.Ct. 1672, 1686, 91 L.Ed. 1903 (1949) (Black, J., dissenting). The court would note that the historical basis for the so-called "incorporation" theory, set out by Justice Black in his dissent in *Adamson,* has come under renewed scholarly attack. *See* R. Berger, *Government by Judiciary* (1977); *also see* Fairman, *Does the Fourteenth Amendment Incorporate the Bill of Rights?,* 2 Stan.L.Rev. 5 (1949). *But see* Curtis, *Further Adventures of the Nine-Lived Cat: A Response to Mr. Berger on Incorporation of the Bill of Rights,* 43 Ohio St.L.J. 89 (1982).

■ Turning more directly to the merits of the case before the court, it is important to observe that the Constitution of the United States guarantees first amendment freedoms "only against abridgment by government, federal or state." *Hudgens v. NLRB,* 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196 (1976). It could thus be reasonably argued that first amendment principles, though clearly applicable to state governments under current standards, warrant no consideration in a case concerning a civil lawsuit between private parties. This argument was rejected by the Supreme Court in *New York Times Co. v. Sullivan,* 376 U.S. 254, 265, 84 S.Ct. 710, 718, 11 L.Ed.2d 686 (1964). In that case, the plaintiff, an elected official of the City of Montgomery, Alabama, had brought a common law action for libel against defendants who had paid for and published an allegedly libelous advertisement in the New York *Times* newspaper. The relevant state law was similar to that followed in the state of North Carolina to the extent that malice and falsity were presumed upon a finding by the trial judge that the advertisement was libelous *per se.* The defendants argued that the application of the presumption of malice by the state court deprived them of their first amendment right to comment upon the conduct of public officials. *New York Times v. Sullivan,* 376 U.S. at 262, 84 S.Ct. at 716. In finding sufficient state action to apply the requirements of the fourteenth amendment, the Court stated that:

> Although this is a civil lawsuit between private parties, the Alabama courts have applied a state rule of law which petitioners claim to impose invalid restrictions on their constitutional freedoms of speech and press. It matters not that that law has been applied in a civil action and that it is common law only, though supplemented by statute [citations]. The test is not the form in which state power has been applied, but, whatever form, whether such power has in fact been exercised. *See Ex parte Virginia,* 100 U.S. 339, 346–347 [25 L.Ed. 676], *American Federation of Labor v. Swing,* 312 U.S. 321 [61 S.Ct. 568, 85 L.Ed. 855].

*New York Times v. Sullivan,* 376 U.S. at 265, 84 S.Ct. at 718.

■ The first amendment, thus, applies to common law actions for libel where application by a court of a state rule of law would result in unlawful restrictions on the constitutional rights of the defendants. *Id.*

■ McDonald agrees that he would be entitled to only a qualified privilege if the only first amendment interests at stake were his right to free speech. Under the *New York Times* standard, the first amendment requires that in libel actions brought by public officials the plaintiff must prove that the defendant published a defamatory statement with actual malice. *New York Times v. Sullivan,* 376 U.S. at 279–80, 84 S.Ct. at 725–726. Actual malice was defined by the Court as knowledge of falsity or reckless disregard of the truth. *Id.* Malice cannot be presumed on the grounds that the words are libelous *per se. Id.* at 283, 84 S.Ct. at 727. Malice must instead be proven by evidence of "convincing clarity." *Id.* at 285, 286, 84 S.Ct. at 728, 729; *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 52, 91 S.Ct. 1811, 1824, 29 L.Ed.2d 296 (1971). *Also see Protecting the First Amendment Right to Petition: Immunity for Defendants in Defamation Actions Through Application of the Noerr-Pennington Doctrine,* 31 Am.U.L.Rev. 147, 150 (1981).

■ The defendants in *New York Times* argued that Alabama law imposed invalid restrictions on only their constitutional freedoms of speech and press. *New York Times v. Sullivan,* 376 U.S. at 265, 84 S.Ct. at 718. McDonald argues, and the court agrees, that decisions interpreting the "speech" clause of the first amendment do not necessarily control cases concerning the "petition" clause. For, as Chief Justice Marshall once stated, "It cannot be presumed that any clause in the Constitution is intended to be without effect; and, therefore, such a construction is inadmissible, unless the words require it." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 174, 2 L.Ed. 60 (1803).

Though McDonald contends that this court is not bound by Supreme Court decisions concerning the "speech" clause of the first amendment, he is unable to cite any decisions by that Court where the relationship between the "petition" clause and actions for libel is discussed directly or by implication. Instead, McDonald seeks to have this court find his communications absolutely privileged based upon Supreme Court cases interpreting the relationship between the petition clause and the Sherman Act. 15 U.S.C. § 1 *et seq.* For the reasons hereafter discussed, the court finds that McDonald's reliance on those decisions is misplaced.

In *Eastern Railroad President's Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), a group of trucking companies and their trade associations brought suit primarily against a group of railroads, for conspiring to restrain trade in and monopolizing the long-distance freight business in violation of §§ 1 and 2 of the Sherman Act.[5] The trucking companies alleged that railroads had conducted a publicity campaign against the trucking industry in order to foster the "adoption and retention of laws and law enforcement practices destructive to the trucking business, to create an atmosphere of distaste for the truckers among the general public, and to impair the relationship existing between the truckers and their customers." *Noerr,* 365 U.S. at 129, 81 S.Ct. at 525. The Supreme Court rejected the truckers' contention that the Sherman Act's sanctions against combinations in restraint

of trade and monopolies applied to the activities engaged in by the railroads, which the Court characterized as "group solicitation of government action." 365 U.S. at 139, 81 S.Ct. at 530. The Court stated that:

A construction of the Sherman Act that would disqualify people from taking a public position on matters in which they are financially interested would thus deprive the government of a valuable source of information and, at the same time, deprive the people of their right to petition in the very instances in which that right may be of the most importance to them.

*Noerr,* 365 U.S. at 139, 81 S.Ct. at 530.

The Court in *Noerr* observed that the evidence indicated that the publicity campaign "deliberately deceived the public and public officials." 365 U.S. at 145, 81 S.Ct. at 533.[6] However, the Court concluded that the Sherman Act was not violated by "campaigns to influence legislation and law enforcement." *Id.*

In *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), an independent coal company charged the United Mine Workers and certain coal companies with conspiring to restrain and to monopolize interstate commerce, in violation of §§ 1 and 2 of the Sherman Act. The plaintiff alleged that defendants had lobbied the Secretary of Labor to raise wage determinations under the Walsh-Healey Act and had also urged the Tennessee Valley Authority to curtail its "spot market" purchases of coal, a sub-

---

**5.** The relevant provisions respectively state:

15 U.S.C. § 1. Trusts, etc., in restraint of trade illegal. Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, is declared illegal . . . .

15 U.S.C. § 2. Monopolizing trade a felony. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a felony . . . .

**6.** The "deception" referred to by the Court did not concern libelous allegations made against the truckers, but instead involved the tactics used by the railroads in conducting their publicity campaign. "[T]he publicity matter in the campaign was made to appear as spontaneously expressed views of independent persons and civic groups, when, in fact, it was largely . . . paid for by the railroads." *Noerr,* 365 U.S. at 130, 81 S.Ct. at 525. Though the defendants were shielded from anti-trust liability, despite their deception regarding the staging of the publicity campaign, it does not necessarily follow that the same defendants would be immune from tort liability if during the course of the campaign they published charges about their competitors they knew to be false.

stantial portion of which was exempt from the Walsh-Healey wage determination. The plaintiff claimed that the ultimate purpose of defendants' lobbying efforts was to eliminate competition by driving smaller companies, unable to pay Walsh-Healey wage rates, out of business. *Pennington,* 381 U.S. at 659–61, 85 S.Ct. at 1587–1588.

In concluding that the UMW and the defendant coal companies were immune from Sherman Act liability, the Supreme Court determined that "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of *intent or purpose.*" 381 U.S. at 670, 85 S.Ct. at 1593 (emphasis added). More specifically the Court stated that "[j]oint efforts to influence public officials do not violate the anti-trust laws even though *intended to eliminate competition.*" *Id.* (emphasis added).

McDonald argues that writing a letter to the President concerning the fitness of a candidate for United States Attorney falls within the category of activity protected by the petition clause. McDonald further reasons that *Noerr-Pennington* insulates any type of conduct that can be characterized as petitioning activity not only from the Sherman Act, but all other types of civil liability.

Addressing first McDonald's second contention, the court determines that the Defendant has misread the scope of the *Noerr-Pennington* rulings. In both cases, the Supreme Court was called upon to construe the congressional intent behind the Sherman Act in light of a possible conflict with the constitutionally-protected right to petition the government.[7] As this court interprets those rulings, it finds that the Supreme Court ruled only that Congress did not intend to regulate through the Sherman Act combinations to influence government decisionmakers by publicity campaigns, lobbying, or the use of the channels and procedures of state and federal agencies,[8] even where the *intentions and purposes* of those involved in the combinations are *anti-competitive and monopolistic.*

> We think it equally clear that the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly. Although such associations could perhaps, through a process of expansive construction, be brought within the general proscription of 'combination[s] ... in restraint of trade,' they bear very little if any resemblance to the combinations normally held violative of the Sherman Act, combinations ordinarily characterized by an express or an implied agreement or understanding that the participants will jointly give up their trade freedom or help one another to take away the trade freedom of others through the use of such devices as price-fixing agreements, boycotts, market-division agreements, and other similar arrangements .... [A]nd we do think that the question is conclusively settled, against the application of the Act, when this factor of essential dissimilarity is considered along with other difficulties that would be presented by a holding that the Sherman Act forbids associations for the purpose of influencing the passage or enforcement of laws.

*Noerr,* 365 U.S. at 136, 137, 81 S.Ct. at 528, 529.

Though the court rejects McDonald's interpretation of the *Noerr-Pennington* decisions, it does conclude that the Defendant's alleged conduct falls within the general protection afforded by the petition

---

7. The Supreme Court in *Noerr* clearly determined that adopting the interpretation of the Sherman Act offered by the plaintiffs in that case could cause a possible conflict with the first amendment. "[S]uch a construction of the Sherman Act would raise important constitutional questions. The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." *Noerr,* 365 U.S. at 137, 138, 81 S.Ct. at 529, 530.

8. *See California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972).

clause of the first amendment. For guidance, the court has reviewed decisions by the Supreme Court concerning libel actions arising out of the District of Columbia. The District was created by Congress by the Act of July 16, 1790, 1 Stat. 130. All subjects of legislation within the District must therefore be consistent with the Constitution of the United States. *District of Columbia v. Thompson Co.,* 346 U.S. 100, 104, 105, 73 S.Ct. 1007, 1009, 1010, 97 L.Ed. 1480 (1953). The federal protections afforded citizens of the several states through the fourteenth amendment, as it is construed today, have therefore always been directly available to the citizens of the District through operation of the Bill of Rights. *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). *Also see Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 380–84, 94 S.Ct. 2997, 3027–3028, 41 L.Ed.2d 789 (1974) (White, J., dissenting).

The court's review of District of Columbia cases has been enlightening. In *White v. Nicholls,* 44 U.S. (3 How.) 266, 11 L.Ed. 591 (1845), the defendants were charged with libeling the plaintiff, Robert White, collector of customs for the Port of Georgetown. The libel took the form of letters addressed to the President of the United States, John Tyler, which contained allegations concerning White's fitness for public office. White filed exceptions with the Supreme Court after the lower court refused to allow White to introduce the letters into evidence at trial. *Id.* at 275–78.

On appeal, counsel for both the plaintiff in error, White, and for the defendants acknowledged that constitutional issues lurked beneath the common law questions raised by the lower court's ruling.[9] The ruling of the lower court was defended by the defendants on two grounds: that the communications were absolutely privileged since defendants had complained of a grievance to the officer who could redress it and that if the communication was not absolutely privileged, "yet it was so much so as to compel the plaintiff to show that the acts were done without probable cause and with malice and that White has failed to make such averments in his declaration." *Id.* at 281.

The Supreme Court concluded that the lower court had erred in keeping the letters from the jury and that the letters could be considered by the jury on the question of malice by the defendants. *Id.* at 291. The Court rejected, first, defendants' contention that White had not adequately pled malicious conduct in his declaration. *Id.* at 284. The Court also ruled that, while the letter to President Tyler could be considered a petition for the redress of grievances, any privilege that attached to the letter was lost if the communication was made maliciously. In so holding, the Court commented that:

> The exposition of the English law of libel given by Chancellor Kent in the second volume of his Commentaries, part 4th, p. 22, we regard as strictly coincident with reason as it is with the modern adjudications of the courts. That law is stated by Chancellor Kent, citing particularly the authority of Best, J., in the case of *Fairman v. Ives,* 5 Barn & Ald., 642 to the following effect: 'That petitions to the king or to parliament, or the secretary of war, for redress of any grievance, are privileged communications, and not actionable libels, provided the privilege is not abused. But if it appears that the communication was made maliciously,

**9.** Counsel for White argued before the Supreme Court that: " 'Under the free dispensation of our Constitution and laws, where the greatest liberty of speech and of publication is allowed, and where this liberty, under the heat of political passions, is ever tending towards licentiousness, in assaults upon political adversaries who may be enjoying in office the fruits of party success, the questions here presented become most interesting, and the decisions that your honors may pass upon them will ascertain the value of that great right, to this description of citizens, "of being secure in their good reputation." ' " *White v. Nicholls,* 44 U.S. at 281.

Defense counsel raised the constitutional issue by arguing that the publication was sent to the President not " 'for the purpose of injuring the plaintiff's character, but solely for the purpose of obtaining his removal from office. It was a perfectly constitutional proceeding . . . .' " *Id.* at 282.

and without probable cause, the pretext under which it was made aggravates the case, and an action lies.'

*White v. Nicholls,* 44 U.S. at 288.

As this court reads *White v. Nicholls,* it is led to the inescapable conclusion that the Supreme Court of 1845 would have ruled accordingly if there were any basis for finding that the first amendment afforded an absolute defense to a libel action that was unavailable at common law in the District of Columbia, a jurisdiction where the Federal Constitution was applicable. The defense found to be available to the defendants in *White v. Nicholls* was thus one of qualified privilege. The qualified privilege so available appears identical to the privilege available to similarly situated defendants in the state of North Carolina who have complained to public officials regarding the fitness of their subordinates. *Ponder v. Cobb,* 257 N.C. 281, 126 S.E.2d 67, 78 (1962); *Alexander v. Vann,* 180 N.C. 187, 104 S.E. 360 (1920); *Ramsey v. Cheek,* 109 N.C. 270, 13 S.E. 775 (1891).

### III. POLICY ISSUES

 McDonald argues that he is entitled to judgment on the pleadings even if the court fails to find that his alleged conduct herein is absolutely protected by the petition clause of the first amendment due to the special circumstances of this case. McDonald advances various arguments in support of this contention. In a nutshell, McDonald requests that this court declare his conduct absolutely privileged from liability for defamation based upon public policy considerations if not upon clear constitutional precedent. The court finds the cumulative weight of McDonald's policy arguments to be unconvincing. It is the Congress, not the federal judiciary, that is assigned the policy-making role in the federal system. Our elected representatives might well conclude that defendants like McDonald must be insulated from liability in order to encourage those with relevant in-

formation regarding presidential appointees to come forward. Whether such a policy is sound is not, however, within the province of a district court.

 If the court were inclined towards fashioning public policy, it could find no basis for concluding that the policies protected by or related to the petition clause were of more significance than the policies advanced by the speech clause. For, as the Supreme Court has stated in a case interpreting the speech clause, "The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people, and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." *Stromberg v. California,* 283 U.S. 359, 369, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931).

 Despite their fundamental nature, first amendment rights have never been considered to be absolute and may in fact be restricted to the extent such restrictions serve a superior governmental interest. *Abood v. Detroit Board of Education,* 431 U.S. 209, 222–32, 97 S.Ct. 1782, 1792–1798, 52 L.Ed.2d 261 (1977); *Civil Service Commission v. National Assn. of Letter Carriers,* 413 U.S. 548, 564–67, 93 S.Ct. 2880, 2889–2891, 37 L.Ed.2d 796 (1973); *Broadrick v. Oklahoma,* 413 U.S. 601, 606, 93 S.Ct. 2908, 2912, 37 L.Ed.2d 830 (1973). As Justice Holmes observed, "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic ...." *Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919). Consistent with this traditional recognition that the first amendment has its limits, the Supreme Court has found previously that complete immunity from liability for defamation is "an untenable construction of the first amendment." *Herbert v. Lando,* 441 U.S. 153, 176, 99 S.Ct. 1635, 1648, 60 L.Ed.2d 115 (1979).[10]

---

10. McDonald's primary argument for absolute privilege is premised largely upon two Supreme Court decisions in which the Sherman Act was interpreted as not reaching combinations to influence government officials. *Eastern Railroad President's Conference v. Noerr Motor*

The *New York Times* decision was rendered "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times v. Sullivan,* 376 U.S. at 270, 84 S.Ct. at 720. The court finds it difficult to discern how the interests and policies affected by the action now before it can be in any way different from those considered by the Supreme Court in *New York Times.*

This court is not the first judicial body to find an identity of interests underlying both the rights of "petition" and free speech. In that regard, the court notes that when the Supreme Court fashioned the requirements that plaintiffs must meet to recover in libel actions involving issues of free speech, it looked for guidance to the North Carolina decision of *Ponder v. Cobb,* 257 N.C. 281, 126 S.E.2d 67 (1962). *See New York Times v. Sullivan,* 376 U.S. at 280, n. 20, 84 S.Ct. at 726, n. 20. In *Ponder v. Cobb,* county election officials sued the defendant for libel after the defendant had written letters to state officers critical of the election officials. The State Supreme Court concluded that the defendant was entitled to a qualified privilege "since the letters involved in these actions were addressed to . . . proper parties from or through whom redress might be expected." *Ponder v. Cobb,* 126 S.E.2d at 78. Thus, the *New York Times* standard that plaintiffs may recover in cases involving issues of free speech only upon a showing of actual malice, *New York*

*Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mineworkers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). *See supra* at 836–838. Yet, even McDonald acknowledges that the anti-trust immunity afforded by these decisions has its limits. As the Supreme Court ruled in a third Sherman Act case, "[f]irst amendment rights may not be used as the means or the pretext for achieving 'substantive evils' which the legislature has the power to control." *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 515, 92 S.Ct. 609, 614, 30 L.Ed.2d 642 (1972). Therefore, while a carrier, in combination with others, has the right of

*Times v. Sullivan,* 376 U.S. at 280, 84 S.Ct. at 726, was based, at least in part, on the common law protection afforded in North Carolina to those who petition the government for the redress of grievances.[11]

## IV. CONCLUSION

The court has reviewed the decisions by lower federal courts cited by McDonald where the *Noerr* and *Pennington* holdings of the Supreme Court have been applied. To the extent those decisions interpret provisions of the Sherman Act, the court finds them inapplicable. To the extent those decisions apply *Noerr-Pennington* to other areas of the law, the court is persuaded by the ruling of the Seventh Circuit Court of Appeals in *Stern v. United States Gypsum,* 547 F.2d 1329 (7th Cir.), *cert. denied,* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977). In *Stern,* an Internal Revenue agent brought an action under 42 U.S.C. § 1985 against a corporation and its officers who had filed complaints concerning the agent's performance. Plaintiff also invoked the district court's pendent jurisdiction over several state claims, including defamation. Defendants argued that under the *Noerr* and *Pennington* decisions their conduct was absolutely privileged under the petition clause of the first amendment.

The Court of Appeals concluded that the act of filing complaints about government officials with their superiors fell within the constitutionally-protected right to petition for the redress of grievances. *Stern v. United States Gypsum,* 547 F.2d at 1342, 1343. However, dismissal of the § 1985

access to agencies and courts, within the limits of their proscribed procedures, to defeat applications of its competitors for certificates as highway carriers (and thereby eliminating the applicants as competitors), the combination may not, consistent with the Sherman Act, conspire to bar the same competitors their rightful access to those same agencies and courts. *Id.*

11. The circle is neatly completed by also noting the identical nature of the protection afforded those who petitioned President Tyler for the redress of grievances in *White v. Nicholls. See supra* at 838–840.

claim was found warranted, not because of the absolute nature of the right to petition, but due to the absence of any congressional intent to regulate the right of petition by way of § 1985. *Id.* at 1344. The state action for defamation was therefore dismissed for want of a federal question. *Id.* at 1346. Despite ordering the dismissal of the action in its entirety, the Seventh Circuit observed that:

> We have no quarrel with the proposition that a state's interest in protecting its citizens from common law torts justifies overriding these First Amendment considerations, when knowing falsity is alleged, and although expressing no opinion one way or the other, we are not to be understood as implying that Stern's [the plaintiff's] common law theories are unmeritorious. A similar overriding of the right to petition might likewise be sustainable in federal legislation which clearly and narrowly intended the effect.

*Stern v. United States Gypsum,* 547 F.2d at 1345.

The court has also considered and declines to follow the decision of the West Virginia Supreme Court in *Webb v. Fury,* 282 S.E.2d 28 (W.Va.1981). For reasons discussed above, this court respectfully concludes that the majority in *Webb v. Fury* has extended the scope of the *Noerr-Pennington* rationale far beyond its proper boundaries.

The court concludes that the matter now before it is controlled by the principles of *White v. Nicholls,* 44 U.S. (3 How.) 266, 11 L.Ed. 591 (1845), and *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny. In rejecting McDonald's request to fashion an absolute privilege based solely upon public policy, the court is guided by the observation of Justice Holmes that "If a thing has been practised for two hundred years by common consent, it will need a strong case for the fourteenth amendment to affect it . . . ." *Jackman v. Rosenbaum Co.,* 260 U.S. 22, 31, 43 S.Ct. 9, 9–10, 67 L.Ed. 107 (1922). Liberty, the Constitution, and the Federal Government have together survived in this country for close to 200 years

despite the fact that defendants like McDonald have been unable to assert a defense of absolute privilege in actions against them for libel.

The court is further guided by a past Supreme Court opinion interpreting the speech clause, which the court finds equally relevant to the petition clause:

> It is a fundamental principle, long established, that the freedom of speech and of the press which is secured by the Constitution, does not confer an absolute right to speak or publish, without responsibility, whatever one may choose, or an unrestricted and unbridled license that gives immunity for every possible use of language and prevents the punishment of those who abuse freedom. [citations] Reasonably limited, it was said by Story [citations] . . . this freedom is an inestimable privilege in a free government; without such limitation, it might become the scourge of the republic.

*Gitlow v. New York,* 268 U.S. 652, 667, 45 S.Ct. 625, 630, 69 L.Ed. 1138 (1925).

■■■ Reasonably limited, the right to petition is of inestimable value to the republic. Without any limitations, the right to petition, in the court's opinion, would render itself meaningless. The right of petition presumes that the government will employ individuals with the abilities needed to redress the legitimate grievances of its citizens. Men and women of competence and integrity clearly would be discouraged, if not entirely dissuaded, from assuming public office if such a sacrifice also required the waiver of *all defenses* against libelous attacks no matter how malicious and false. *See White v. Nicholls,* 44 U.S. at 284.

■■■ For all the reasons discussed above, the court will deny McDonald's motion for judgment on the pleadings. The test applicable for judgment on the pleadings is whether or not, when viewed in the light most favorable to the party against whom the motion is made, genuine issues of material fact remain or whether the case can be decided as a matter of law. *King v. Gemini Food Services, Inc.,* 438 F.Supp. 964, 966 (E.D.Va.1976), *aff'd,* 562 F.2d 297 (4th

Cir.1977), *cert. denied,* 434 U.S. 1065, 98 S.Ct. 1242, 53 L.Ed.2d 766 (1978). McDonald is not entitled to judgment as a matter of law since Smith can prevail provided he proves actual malice by McDonald. *New York Times v. Sullivan,* 376 U.S. at 279–80, 84 S.Ct. at 725–726. In order to establish McDonald's actual malice at trial, Smith will be required to introduce evidence of "convincing clarity" [12] that McDonald knew that the statements contained in the letters to President Reagan were false or that he acted in "reckless disregard" of the truth of said allegations.

An Order will be entered accordingly.

12. *See Rosenbloom v. Metromedia, Inc.,* 403 U.S. at 52, 91 S.Ct. at 1824.