**Terry C. KNAPP, Plaintiff,**

v.

**Harry WHITAKER; Russell McDavid; John Hatton; Peoria School District No. 150, a body politic and corporate, and George Burdette, Defendants.**

No. 81–1185.

United States District Court,
C.D. Illinois,
Peoria Division.

Dec. 5, 1983.

Michael Radzilowsky, Chicago, Ill., Patricia C. Benassi, Peoria, Ill., for plaintiff.

Julian E. Cannell, Peoria, Ill., for defendants.

## ORDER

MIHM, District Judge.

On November 12, 1981, Plaintiff, Terry C. Knapp, a public high school teacher, filed suit against Peoria School District No. 150 and three individually named Defendants, Harry Whitaker, Superintendent of Schools; Russell McDavid, Principal of Woodruff High School; and John Hatton, Assistant Principal, alleging an abridgment of his First Amendment right to free speech and further alleging that Defendants had retaliated against him for exercising his First Amendment rights. An additional Defendant, George Burdette, the Assistant Superintendent of Schools, was named at a later date.

After a jury trial, which began January 25, 1983, Plaintiff was awarded $514,333 in compensatory damages.[1] Immediately prior to trial the Plaintiff filed a motion for partial summary judgment, requesting the Court to rule that his speech was, as a matter of law, protected by the First Amendment and that the actions taken by the Defendants, in response to Plaintiff's protected speech, constituted a violation of his First Amendment rights. At trial, the Court ruled that Mr. Knapp's speech was protected and that the Board policy, relied on by the Defendants as justification for their actions against Plaintiff, was unconstitutional on its face as well as the manner in which it was applied to Mr. Knapp.

The jury was advised of the Court's ruling by jury instruction[2] and were given four two-part special interrogatories to record their verdict. The jury answered these in favor of the Plaintiff in each instance, specifically finding that Knapp's constitutionally protected conduct was a "substantial or motivating factor" in the Defendants' decision to transfer Plaintiff, deny him a personal leave day, give him negative evaluations, and remove him from his coaching position.

Following trial, the Defendants' motions for judgment notwithstanding the verdict, for a new trial, or amendment of the judgment were denied by the Court.

On April 22, 1983, the Defendants filed a notice of appeal to the Seventh Circuit. The Seventh Circuit, pursuant to the De-

---

**1.** The Court by written order dated December 17, 1982, denied Plaintiff's request to add a punitive damage claim to the complaint.

**2.** The jury was instructed as follows:
The Court finds that school board regulation 2111.11 directing that communications to board members be made through the office of the Superintendent is unenforceable. The actions by Terry Knapp in speaking to board members, both individually and at a public meeting, were protected by the First Amendment of the Constitution of the United States.
The Court also finds that the following conduct violated Terry Knapp's rights:

1. The oral reprimand given to Terry Knapp by Harry Whitaker on April 1, 1981.
2. The language contained in the memorandum written by Harry Whitaker to the Board of Education of District 150 on April 1, 1981, referring to Terry Knapp's violation of board policy.
3. The written reprimand prepared on April 2 by Harry Whitaker and given to Terry Knapp on April 6.
4. The language placed in Terry Knapp's April 29, 1981 evaluation referring to his violation of board policy.

fendants' motion to vacate the District Court's judgment or stay appeal and remand the record in light of the Supreme Court's decision in *Connick v. Meyers*, —— U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), denied the motion to vacate but remanded the case to the District Court for reconsideration.

FACTS

The history of this case dates back to the fall of 1980, when the teachers and School District 150 were engaged in collective bargaining negotiations. During these negotiations, one of the three most important topics (according to the teachers) was the issue of the effectiveness of the operation of the grievance procedure under the collective bargaining agreement.

The teachers made their dissatisfaction with the grievance procedure known to the school board at a school board meeting on October 20, 1980. At that meeting, the board members present invited any teachers with examples of how the grievance procedure was not working to bring them to their attention.

Pursuant to this invitation, the Plaintiff contacted board member Betty Cleaver, informing her that he had information about the grievance procedure. Plaintiff and Mrs. Cleaver scheduled a meeting to discuss the grievance procedure at a later date and Mrs. Cleaver indicated that it would be appropriate for Mr. Knapp to contact other board members regarding the grievance procedure. During the week following the October 20 board meeting, the Plaintiff met with several board members to discuss the grievance procedure.

There is no dispute that Plaintiff arranged these meetings at the convenience of the respective board members and was courteous and well mannered throughout. The meetings took place at either the board members' homes or offices.

At these meetings, the Plaintiff explained how the grievance procedure had failed to work in the past and gave specific examples of its failure. The examples cited by Plaintiff involved problems with mileage and liability insurance, evaluations, curriculum and classroom assignments. Plaintiff cited these examples primarily in the context of the failure of the grievance procedure.[3]

All of the board members actively participated in the conversations with Mr. Knapp and indicated their desire for future communications. At no time during these meetings was Mr. Knapp informed that he was violating any board policy nor did any board members seek to have Mr. Knapp disciplined for his conduct.

Furthermore, while some of the board members contacted Superintendent Whitaker and informed him of Plaintiff's conversations with them, Mr. Whitaker made no effort to inform Mr. Knapp that he was in violation of board policy or had done anything improper.

In March, 1981, Plaintiff filed a grievance based on (1) the unequal mileage reimbursement from the school district with regard to coaches and (2) the lack of liability insurance provided to coaches who drove students to athletic events. The grievance was denied, however, on the basis that it involved a matter not personal to Plaintiff and was considered a "class action" matter.

Following this denial, Plaintiff attempted to obtain sponsorship at the next school board meeting to be held April 6, 1981 in order to express his views regarding the grievance procedure. He contacted several board members for this purpose and sent a copy of his previously denied grievance to all board members (at board member Ed Glover's request and with the permission of Defendant Russell McDavid). Eventually,

---

3. The Defendants in their memorandum attempt to place each of the examples cited by Mr. Knapp evidencing the ineffectiveness of the grievance procedure on an equal footing. However, at trial the primary focus was on the grievance procedure itself and the examples of

its ineffectiveness in dealing with the mileage reimbursement and the liability insurance issues. The classroom allocation and curriculum issues received relatively little attention during the trial.

board member Marilyn Ketay agreed to sponsor Knapp at the April 6 meeting.

On April 1, 1981, Superintendent Whitaker met with Plaintiff and orally reprimanded him for his conduct of contacting board members. At this meeting, Whitaker informed Plaintiff of board regulation 2111.-11, which requires that any communications to board members be made through the office of the Superintendent. Whitaker told Knapp at this meeting that he was "not to talk to any board member about any educational issues". Mr. Knapp indicated to the Superintendent that he felt this violated his rights, to which Mr. Whitaker responded "Your rights end where my nose begins". Mr. Whitaker concluded by indicating that any further contacts by Knapp to board members would result in Mr. Knapp being found insubordinate.

That same day Mr. Whitaker sent a written memorandum to the Board of Education, severely criticizing Knapp for contacting board members, and indicating that he would monitor Mr. Knapp's conduct in the future. He also expressed his opinion of Mr. Knapp's grievance. The memo to the Board reads as follows:

"I have been receiving information that Terry Knapp is contacting the Board again on an issue concerning payment for the transportation of students. In fact, Dr. Glover has said that Terry has talked to him and he is probably going to sponsor him Monday night. I think Marilyn has also been contacted by Terry plus, I believe, he sent each Board member a written grievance. I don't know if he has contacted any of you by phone, other than Dr. Glover and Marilyn Ketay.

I asked for a meeting with Terry and I met with him this morning. I pointed out that Board policy 2111.10, Superintendent of Schools, Item # 11 states 'communicate, or cause to be communicated, to all employees all action of the Board relating to the several employees, and all communications made to the Board shall be through him.' I pointed out that this wasn't the first time that he

was outside of Board policy and that from now on communication with the Board should go through the superintendent. He was very argumentative, as always, and said Board members encouraged him to call them, write them, etc. and that he was going to pay attention to the Board members. I again pointed out to him that he is outside of Board policy and that I expected him to stay within Board policy.

If Terry continues to bypass the administration with regard to communications, I am going to recommend his dismissal. He is becoming a person who is quite belligerent and creates havoc at Woodruff High School. I am sorry that Russ ever employed him because this has been his history at other school districts. I will keep you posted.

His gripe is that Woodruff only pays him 12 cents per mile when he transports youngsters for ball games. Student Activity Funds Policy 5135.11 speaks to the authority of the superintendent and principal with regard to setting regulations and policies for the school activity fund. Items 2, 3, 21, and 22, I believe, give the superintendent and principal the right to regulate the activity funds and determine how much will be paid to those who work in the activities.

Also, Board Policy 4116.2 states that 'a grievance' is a condition in the school system which an individual teacher believes is wrong, unjust or oppressive, but excluding *issues* such as changes in salary and policy of the Board of Education which relate to teachers as a whole. Since the teachers at Woodruff are all treated alike with regard to how much they are paid for transportation of students, we believe this is an issue related to teachers as a whole and therefore is not grievable.

There is a fine line here because some of the teachers in some of the other schools might get paid more according to the wealth of their athletic fund, but they are all paid evenly. In other words, we don't have individual athletic funds paying teachers at different rates.

I am sure Terry is going to pursue this matter. So far, we believe we are on solid ground. I am going to continue monitoring Terry's actions."

On April 2, 1981, Mr. Knapp requested a personal leave day to see a lawyer to obtain information concerning his rights to speak at the board meeting. Mr. Knapp's request was denied on Friday, April 3, 1981.

On April 6, 1981, Plaintiff received the following written reprimand from Mr. Whitaker:

"This letter is to record a conference held by me with Terry Knapp, teacher at Woodruff High School. Also present were John Hatton and Roger Clemer, administrative assistants at Woodruff High School.

I asked for the conference with Terry to point out to him that he is in violation of board policy 2111.10 which deals with communication with Board members without first sending these communications to the Superintendent of Schools. This has been taking place for some time and I have not been concerned. However, I believe now that it has become somewhat of a problem. I asked Terry at the conference to stay within board policy. I don't believe that he was aware that he was in violation of Board policy and I believe he will not deliberately violate the policy in the future. He has been asked to remediate this aspect of his conduct.

This letter is to be placed in Terry's personnel file. Harry F. Whitaker."

At the April 6 board meeting, Mr. Knapp was called to the podium and Marilyn Ketay announced that she was sponsoring him to speak at the meeting. When Mr. Knapp began to speak, however, Mr. Whitaker stated to him: "You are out of order. You cannot talk at this board meeting, you are talking on a personal issue".

Despite Mr. Whitaker's statements, Mr. Knapp was allowed to speak by the board members and related to those present what he perceived to be the problems with the grievance procedure.

On April 29, Mr. Knapp was given an evaluation which, among other things, admonished him for talking to board members both individually and at public meetings about his personal employment problems (in violation of board policy 2111.11) and ordered him to refrain from doing so in the future. He was placed in a remediation category which is one step above discharge.

On June 16, 1981, he was removed from his coaching position at Woodruff High School. The Defendants have asserted that Plaintiff was removed from his coaching position because of his phlebitis condition. Later, in the fall of 1981, Knapp's paid study hall was taken away from him because of his remediation status and at the end of the 1981–82 school year he was given a second critical evaluation and was involuntarily transferred from Woodruff High School to Harrison Grade School.

## DISCUSSION

This case has been remanded to the District Court for reconsideration in light of the Supreme Court's decision in *Connick v. Meyers*, —— U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). However, I do not believe that the *Connick* case requires a reversal of either the Court's or the jury's earlier findings.

In *Connick*, an assistant district attorney in New Orleans, after objecting to her transfer to another section of the criminal court, circulated a questionnaire to her fellow staff members. The purpose of the questionnaire was to solicit:

"the views of her fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, a level of confidence in the supervisors, and whether employees felt pressured to work in political campaigns". *Connick*, —— U.S. at p. ——, 103 S.Ct. at p. 1687.

One of the other assistant district attorneys contacted the district attorney for the Orleans Parish, Harry Connick, and informed him that Meyers was creating a "mini insurrection" within the office. Con-

nick then met with Meyers and told her that she would be terminated for her refusing to accept the transfer and that her circulation of the questionnaire was "an act of insubordination".

The Court, in examining whether the plaintiff's rights had been violated, first focused on whether Meyer's questionnaire could be "characterized as constituting speech on a matter of public concern". *Connick,* —— U.S. at p. ——, 103 S.Ct. at p. 1689. After determining that *one* of the questions in the questionnaire "touched upon a matter of public concern, and contributed to her discharge", the Court was then required to determine "whether Connick was justified in discharging Meyers". *Connick,* —— U.S. at p. ——, 103 S.Ct. at p. 1691.

The Court concluded:

"Meyers' questionnaire touched upon matters of public concern in only a most limited sense; her survey, in our view, is most accurately characterized as an employee grievance concerning internal office policy. The limited First Amendment interest involved here does not require that Connick tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships. Meyers' discharge therefore did not offend the First Amendment." *Connick,* —— U.S. at p. ——, 103 S.Ct. at p. 1693.

I believe that while *Connick* may be factually distinguishable from our case, even the application of the principles set forth in *Connick* do not support a change in any earlier rulings by this Court.

Following the principles set forth in *Connick,* the Court must first consider whether Mr. Knapp's speech involved a matter of "public concern". As stated in *Connick:*

"Our task, as we defined it in *Pickering* [*Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) ], is to seek 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency

of the public services it performs through its employees'." 391 U.S., at 568 [88 S.Ct., at 1734]. *Connick,* —— U.S. at p. ——, 103 S.Ct. at p. 1687.

\*    \*    \*    \*    \*    \*

"*Pickering,* its antecedents and progeny, lead us to conclude that if Meyers questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge. When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick,* —— U.S. at p. ——, 103 S.Ct. at p. 1689.

\*    \*    \*    \*    \*    \*

"We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of a personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick,* —— U.S. at p. ——, 103 S.Ct. at p. 1690.

■ Conversely, an employee's speech on matters of public concern occupies the "highest rung of the hierarchy of First Amendment values" and is entitled to special protection. *Connick,* slip opinion at p. 6 (citations omitted).

Whether certain speech may be considered a matter of public concern is determined by the "content, form, and context of a given statement, as revealed by the whole record". *Connick,* —— U.S. at p. ——, 103 S.Ct. at p. 1689.

■ The issue of whether Mr. Knapp's speech involved matters of "public concern" was not really developed before or

during the trial.[4] However, it is clear that the thrust of his meeting with individual board members and at the board meeting was to make known the problems with the grievance procedure. Mr. Knapp made his comments in response to the board members' express request that they be made aware of any problems any teacher had with the grievance procedure. The board members were anxious to learn of Mr. Knapp's problems and even requested that he contact them in the future.

In contrast, the Plaintiff in *Connick* distributed the questionnaire solely in response to her displeasure with her transfer. Furthermore, as the Court noted in *Connick:*

"Meyers did not seek to inform the public that the district attorney's office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases nor did Meyers seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick and others." *Connick*, —— U.S. at p. ——, 103 S.Ct. at p. 1690.

However, this is precisely what Mr. Knapp was attempting to do in this case. The effectiveness and proper operation of the grievance procedure was an important issue to the teachers in District 150 and could potentially affect the efficient operation of the school system as a whole. His conversations with the board members and at the board meeting were an attempt by him to make the issues known and seek to have the problems as he perceived them corrected.

Furthermore, some of the examples cited by Mr. Knapp indicating the ineffectiveness of the grievance procedure were clearly and unequivocally matters of public concern. For instance, Mr. Knapp's concern with the school district's liability insurance affected not only the teachers in the school district but also the students and their parents, who occasionally provided transporta-

tion to athletic events. Indeed, the Defendants' original denial of Mr. Knapp's grievance on this issue was because they felt it was in the nature of a "class action" rather than merely a personal matter.

Accordingly, the Court finds that Mr. Knapp's speech, with its focus on the operation of the grievance procedure, was a matter of public concern.

At this point, the Court would like to indicate its complete disagreement with the statement on page 14 of the Defendant's Memorandum on Remand which states:

"*If any or all* of Knapp's speech was unprotected, Defendants must be granted judgment notwithstanding the verdict, and Plaintiff must be 'out of court'." (emphasis added).

This result is entirely contrary to the Court's decision in *Connick*. The Court in *Connick* stated:

"Because *one* of the questions in Meyers' survey touched upon a matter of public concern, and contributed to her discharge we must determine whether Connick was justified in discharging Meyers." *Connick*, —— U.S. at p. ——, 103 S.Ct. at p. 1691. (emphasis added).

The Defendants seem to have inverted the holding of the *Connick* case. This Court must determine whether any or all of Knapp's speech was protected rather than unprotected as suggested by the Defendants. If *any* of the speech is found to be protected (as the Court has already indicated it is) then the Court must move to the next stage of the *Connick* test and balance the interests of the school district in the efficient operation of its system with the Plaintiff's right to speak on matters of public concern.

Initially, with regard to the balancing test, the Court notes that there were no allegations by the Defendants that Plaintiff's conduct was in any way whatsoever disruptive in nature. In fact, the counsel

---

**4.** At the trial, the overwhelming thrust of the defense was that legitimate reasons existed for every action that the Defendants took and their conduct was not pretextual. Apparently now, on appeal, the Defendants have decided to change the focus of their defense.

for the Defendants stated at the jury instruction conference:

"We are not going to have a factual question here for the jury on whether or not the speech disrupted the activities at Woodruff High School. The jury is not going to be called upon to answer that question because we don't have a disruption issue here."

Thus, Mr. Knapp's conduct could not be viewed as a "mini insurrection" as was the case in *Connick*. Further, there is no evidence that Knapp's conduct interfered with his ability to perform his responsibilities.

In *Connick* the Court considered the manner, time, and place in which the protected speech was made to be a relevant factor in the balancing test. There the Court noted that the questionnaire was prepared and distributed at the office in a manner which distracted Meyers as well as their colleagues from their official work. Again, this does not appear to be the case with Mr. Knapp's conduct. His speech in the fall of 1980 was done in response to the board members' request that they be informed of problems with the grievance procedure. As noted previously, the board members encouraged the initial contact from Mr. Knapp as well as any subsequent information he could relate to them regarding the grievance procedure. In the spring of 1981, Mr. Knapp contacted certain board members requesting that they sponsor him for the April 6 school board meeting.[5] After receiving his sponsorship, Mr. Knapp spoke at the board meeting regarding the operation of the grievance procedure.

At no time during his conversations with the board members was he informed that he was in violation of board policy nor did any of the members seek to have him disciplined for his actions.

The Defendants have attempted to justify their actions based on board policy 2111.11, which requires that communication between any employee and a board member must be made through the Superintendent of Schools. Board policy 2111.11, listed under the "Powers and Duties" of the Superintendent, states:

"Communicates, or cause to be communicated, to all employees, all actions of the Board relating to the several employees, and all communications made to the Board shall be through him."

Mr. Knapp was first informed of board policy 2111.11 at his meeting with Superintendent Whitaker on April 1, 1981.

■ This Court believes that board policy 2111.11 was unconstitutional both on its face and its application to Mr. Knapp. The requirements of policy 2111.11 were not limited to personal or non-public matters (or written as opposed to oral communication) but included *any* communications to a board member. By channeling all communications to board members through the Superintendent, the Superintendent is given complete control in determining which items will reach the ears of the board members. The policy sets no guidelines or limits on the Superintendent's discretion in this area.

The application of this policy in the case before us demonstrates its unconstitutionality. In the fall of 1980 Mr. Knapp communicated with board members with the knowledge of Superintendent Whitaker and no action was taken. However, in the spring of 1981, when the school administration apparently began to disapprove of Plaintiff's actions, Mr. Whitaker cited policy 2111.11 in an attempt to silence Mr. Knapp.

Board policy 2111.11 is not contained in the teachers job description but is only found in the Superintendent's job description. There is no indication that any teacher had been informed of its existence nor had any teacher ever been disciplined for its violation. In fact, several teachers testified that they had communicated both orally and in writing to board members without channeling their communications through the Superintendent.

5. Anyone wishing to speak at a school board meeting was required to obtain sponsorship from a board member in order to speak at a board meeting.

Thus, the Court ruled, as a threshold matter, that policy 2111.11 was violative of the First Amendment. Accordingly, the Defendants could not rely on policy 2111.11 to justify their reprimand of the Plaintiff or for restricting his speech to board members both individually and in public meetings.

■ Finally, the Court must consider the context in which the dispute arose. If an employee's speech involves "an employment dispute concerning the very application of that policy to the speaker", the employer's belief that his authority may be subverted is entitled to greater weight. See *Connick*, —— U.S. at p. ——, 103 S.Ct. at p. 1693.

While Mr. Knapp was affected by the issues he presented to the board members the record does not indicate that he was motivated solely by personal interest. The grievance procedure was listed by the teachers as one of the three most important issues in the collective bargaining negotiations in the fall of 1980. It was a topic on which the board members felt they were not fully informed and encouraged teachers to make known to them any relevant facts regarding the grievance procedure.

Also, as mentioned previously, the liability insurance issue cited by Mr. Knapp affected not only Mr. Knapp and all the teachers in the district but the students and their parents as well. Thus it could not be said that Plaintiff, in reporting to board members the problems with the grievance procedure, was motivated by purely personal reasons.

■ As to Defendants' comments (page 31 of their Memorandum on Remand) that the giving of jury instruction # 10 was reversible error, I can only say that the jury instructions in the case were hammered out over several hours of lively debate. Instruction 10 was given because the Court concluded that the jury had to know that the Court had determined the protected nature of the speech. If this had not been done, the jury would have been forced to consider the interrogatories in a vacuum. If the speech was not protected, the interrogatories were meaningless to begin with.

Based on the foregoing discussion it is the Court's decision that the case of *Connick v. Meyers*, —— U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), does not affect any of this Court's rulings in this case and, therefore, IT IS ORDERED that the Defendant's Motion for Reconsideration is DENIED.