Anne GREGORY, Steve K. Toggerson, and the Durham County Chapter of the North Carolina Association of Educators, Plaintiffs,

v.

DURHAM COUNTY BOARD OF EDUCATION and J. Frank Yeager, Superintendent, Defendants.

Civ. No. C–81–700–D.

United States District Court, M.D. North Carolina, Durham Division.

May 24, 1984.

James C. Fuller, Jr., Leslie J. Winner, Charlotte, N.C., for plaintiffs.

James B. Maxwell, Durham, N.C., for defendants.

## MEMORANDUM OPINION

BULLOCK, District Judge.

This action is a lawsuit by two teachers in the Durham County school system, Steve K. Toggerson and Anne Gregory, and the local chapter of the North Carolina Association of Educators (NCAE), as representative of its teacher members, against the Durham County Board of Education (Board of Education) and the Durham County Superintendent J. Frank Yeager. Plaintiffs seek, along with declaratory relief, removal of letters from the two teachers' personnel files which were purportedly written in retaliation for their criticism of the school administration in alleged violation of their first amendment rights.

By order entered February 9, 1983, the court dismissed several of the claims set forth in Plaintiffs' original complaint, and on October 11, 1983, Plaintiffs and Defendant Board of Education stipulated to the dismissal of another. Five claims remained for trial: (1) the claim by Anne Gregory under 42 U.S.C. § 1983 that a letter by an assistant superintendent in her personnel file relating to a grievance she brought against the school administration in the spring of 1980 violates her first amendment right to freedom of speech and right of petition, and (2) her additional claim that the letter violates her employment contract; (3) the claim by Steve Toggerson under 42 U.S.C. § 1983 that a letter in her file by Defendant Yeager regarding an article she wrote for an NCAE publication in 1981 violates her first amendment free-speech rights and (4) her additional claim that the letter and certain oral statements by Yeager constitute libel and slander; and (5) the claim by the Durham County Chapter of the NCAE under 42 U.S.C. § 1983 on behalf of its teacher members that the letters in Gregory's and Toggerson's personnel files chill the members' right to free speech in violation of the first amendment.

Trial by this court without a jury was held on these claims on February 27 through February 29, 1984. At the close of Plaintiffs' evidence, Defendant Yeager moved orally for dismissal of Toggerson's libel and slander claim pursuant to Fed.R. Civ.P. 41(b). The court reserved its ruling. For the reasons set forth below, the court will grant Defendant Yeager's motion and also enter judgment for Defendants on all claims.

## FINDINGS OF FACT

### A. *Parties*

1. Plaintiff Anne Gregory is an adult resident of Durham County, North Carolina. Since 1974 she has been employed as

an elementary school teacher by the Board of Education.

2. Plaintiff Steve K. Toggerson is an adult resident of Durham County, North Carolina. Since 1972 she has been employed by the Board of Education as a junior high school teacher.

3. Plaintiff Durham County Chapter of the NCAE is an organization whose members include teachers in the Durham County school system. The original complaint named the Durham County Association of Classroom Teachers (ACT) as the teacher organization representing the Plaintiff teachers, but during the pendency of this litigation it merged into the NCAE. On motion made at trial, the Durham County Chapter of the NCAE was substituted for the Durham County ACT in the complaint.

4. Defendant Board of Education is a corporate governmental body established pursuant to N.C.Gen.Stat. §§ 115C–1, *et seq.* As such, it has principal responsibility for the control and supervision of the Durham County school system.

5. Defendant J. Frank Yeager is an adult resident of Durham County, North Carolina, and since 1973 has been employed by the Board of Education as Superintendent of the Durham County school system. As Superintendent, he is the chief administrative officer of the school system. *See* N.C.Gen.Stat. §§ 115C–271 to –278.

### B. *Plaintiff Gregory's Claims*

6. In 1977, the North Carolina legislature adopted a program, the Primary Reading Program (Program), to provide funds to local school systems for the employment of teacher aides in order to improve reading instruction in the state's elementary schools. Standards, Policies and Guidelines of the Primary Reading Program, promulgated by the State Board of Education, required that teachers receive at least five (5) days of training prior to their participation in the Program. By the spring of 1980, there were four elementary schools in the Durham County system, employing approximately forty-five (45) reading teachers, which had not yet begun the Program,

including the school at which Gregory worked. The administration of the Durham County system planned to train these teachers and initiate the Program at these schools at the start of the 1980–81 school year.

7. At a faculty meeting in the spring of 1980, Joyce F. Wasdell, an assistant superintendent of the Durham County system, distributed a memorandum, dated April 22, 1980, to Anne Gregory and other teachers present regarding the schedule for the required Program workshops. They were to begin four (4) weekdays before the previously scheduled starting date for teachers on Tuesday, August 12, 1980, and to continue through Thursday, August 14, 1980. Two of six regular pre-school (*i.e.,* prior to the start of classes) work days were also to be devoted to the Program, bringing the total time to the required five days. The workshops were scheduled to begin early to avoid taking more than two regular pre-school work days for the Program, the remaining four days being needed by teachers to prepare their other class and administrative work.

8. Gregory found the scheduling of the Program workshops objectionable because, among other reasons no longer relevant to this litigation, the early start interfered with her vacation plans. In May 1980, Gregory met with an NCAE official and approximately twenty other teachers to discuss the matter. As a result of the meeting, Gregory filed a grievance against Assistant Superintendent Wasdell. At a meeting in early June 1980, Wasdell denied Gregory's request to reschedule the workshops.

9. Gregory exercised her right under the school system's grievance procedure to appeal the denial to the assistant superintendent of personnel. At a meeting on June 18, 1980, he too declined to change the workshop schedule. Gregory pursued her grievance to the next level, Superintendent Yeager. In a letter to Gregory dated July 2, 1980, Yeager defended the scheduling, but indicated that the administration would

work with individual teachers to resolve conflicts they had with the workshop schedule that were beyond their control.

10. Gregory interpreted Yeager's letter as providing for only case-by-case relief. Viewing herself as the representative of the other eighteen (18) teachers who had indicated that they would be inconvenienced by the workshop schedule, she found Yeager's letter unsatisfactory because it did not provide a more general solution. She therefore made the final appeal permitted her, to the Board of Education. At its meeting in executive session on July 21, 1980, the Board found that Superintendent Yeager's offer to work with individual teachers on their scheduling problems provided Gregory an adequate administrative remedy and declined to take any other action regarding the matter. It was mentioned at the meeting that nineteen (19) of the forty-five (45) teachers to receive Program training claimed a conflict with the workshop schedule, a fact previously not understood by Wasdell and other administrators. The Board nevertheless, without objection, treated Gregory's grievance as one solely on her own behalf.

11. Now understanding the apparent seriousness of the scheduling problem, Assistant Superintendent Wasdell the day after the Board meeting, July 22, 1980, sent to Gregory and the other teachers who were to participate in the workshops a memorandum setting forth an alternate schedule that would not require them to report to school early. The alternate schedule provided for workshops on Monday, August 18, through Wednesday, August 20, 1980, and again on Monday, August 25, 1980, from 4:00 p.m. until sometime between 9:00 and 10:00 p.m. depending on the day. The two regular work days devoted to the Program were also apparently to be attended by those in the alternate workshops in fulfillment of the five-day training requirement. Wasdell indicated that all requests for the alternate schedule were to be made promptly in writing.

12. In response to Wasdell's memorandum of July 22, 1980, Gregory sent her a letter dated July 31, 1980, the text of which read as follows:

> In response to your letter dated July 22, 1980, please be advised that it is my intention to report to work on August 18. Because I am not satisfied with the requirement to work from 8:30–3:30 and from 4:oo [sic]—10:00 P.M., I have conferred with an attorney who may advise me otherwise.

By this letter, Gregory sought to indicate that she intended to participate in the alternate workshops, but that because of her dissatisfaction with the long work hours involved she had consulted an attorney who might advise her not to attend.

13. Assistant Superintendent Wasdell interpreted Gregory's letter as an unambiguous and shockingly insubordinate refusal by her to attend either the regular or alternate workshops, which she might recant if her attorney advised her accordingly. Wasdell responded with a letter to Gregory dated August 4, 1980, in which she criticized Gregory for her "apparent lack of interest in the instructional program" and disclosed her recommendation to Yeager that Gregory be terminated if she did not attend either set of workshops.

14. Prior to the time Wasdell's letter left her office in the mails, she read a letter containing almost the same language used in Gregory's letter of July 31, 1980, from a teacher who had not filed a grievance regarding the workshop scheduling. In this letter, however, the teacher indicated she intended to report to work on the appropriate date "using Plan B." Wasdell interpreted this letter as a proper request for the alternate workshops and responded to her in a one-sentence letter welcoming her attendance at them.

15. Gregory was alarmed by Wasdell's letter, which she received on August 5, 1980. During her tenure in Durham she had not previously received any criticism of her performance. Gregory sent a response to Wasdell on the same day explaining the intended meaning of her letter, and ex-

pressing her apology for its apparent failure to make her intentions clear, but also her continuing dissatisfaction with the scheduling of the workshops. Wasdell has never responded to this letter.

16. Several days after Gregory wrote her letter, she received notification pursuant to N.C.Gen.Stat. § 115C–325(b) that her correspondence with Wasdell (*i.e.*, Gregory's letters of July 31 and August 5, 1980, and Wasdell's memorandum of July 22, 1980, and letter of August 4, 1980) would be placed in her personnel file. Wasdell believed that placement of the correspondence in Gregory's file was required by N.C.Gen.Stat. 115C–325(b) which directs that any "complaint" about a teacher be placed in his or her personnel file. The placement of Gregory's correspondence with Wasdell in her file reduced her willingness to criticize the school system administration. Gregory subsequently sought removal of these materials from her file through the grievance procedure but her grievance, appealed ultimately to the Board of Education, was denied. Grievance procedure rules applicable to Gregory at all times relevant to this litigation prohibited retaliation against any participant in the grievance procedure on account of such participation. Gregory attended the alternate workshops as did only two (2) of the other eighteen (18) teachers who had claimed a conflict with the original workshop schedule.

17. In a news release dated August 11, 1980, the NCAE sharply criticized the administration for placing Wasdell's August 4, 1980, letter in Gregory's file, suggesting that it was done in retaliation for her pursuing her grievance. Although Gregory was not named in the newsletter itself, she was named in a cover note from an NCAE official which was attached to some but not all copies of the news releases that were distributed. In its August 16, 1980, edition *The Carolina Times*, a weekly newspaper published in Durham, North Carolina, ran as its lead story an article based virtually verbatim on the news release.

18. Wasdell was shocked by what she perceived as the untruthful implications of the news release and article. Receiving a number of telephone calls from teachers and others regarding the news release and article, she became concerned that the publicity could undermine her relationship with teachers in the school system. She assumed that Gregory had disclosed the information being publicized and had thereby waived any privacy interest she otherwise had in the materials in her file. After consultation with Superintendent Yeager, Wasdell sent copies of the materials in Gregory's file relating to the workshop scheduling to the principals of all schools in the Durham County system with instructions to post it, along with a cover memorandum, in an effort to present her side of the matter. The posting of the file materials humiliated Gregory and reduced her willingness to criticize the school system administration for fear of retaliation by placement of letters in her personnel file.

19. On November 4, 1981, Gregory brought the instant action along with her co-Plaintiffs against Defendants.

C. *Plaintiff Toggerson's Claims*

20. In January 1981 the North Carolina Association of School Administrators (NCASA), headed by its president Defendant Yeager, formally joined with the Congress of Parents and Teachers and the North Carolina School Boards Association to form an organization, the North Carolina Alliance for Public Education (Alliance), for the purpose of promoting their common interests before the North Carolina legislature and elsewhere. The Alliance formally supported increases in salaries for teachers and administrators, as well as revisions in the salary scale to establish what it considered a more appropriate proportionality between teacher and administrator salaries at certain levels. Although it advocated what it termed meaningful involvement by teachers in school decisions that affected them, the Alliance opposed collective bargaining. For this reason, it did not invite the NCAE, an advocate of collective bar-

gaining, to join. The Alliance took no position on the so-called Teacher Tenure Act or Fair Employment and Dismissal Act, now codified at N.C.Gen.Stat. §§ 115C–325, *et seq.*, which the School Boards Association opposed. Under the Alliance by-laws each member organization was free to determine its own policies independent of the Alliance.

21. Superintendent Yeager as an NCASA officer and as Superintendent supported higher teacher salaries and had on one occasion been formally recognized by the NCAE for his work in that area. He opposed collective bargaining, like the Alliance, but, in contrast to the Alliance's neutral stance, did support the Teacher Tenure Act.

22. In February 1981 an article by Plaintiff Toggerson appeared in the newsletter of the Durham County ACT, *Chalk Talk*. Approximately fifty per cent (50%) of the teachers in the Durham County system belonged to the Durham County ACT and were sent this newsletter. The article, appearing to misstate the formal positions of Yeager and the Alliance, criticized them as anti-teacher. Under the headline "Coalition Lobbies Against Teachers" and Toggerson's by-line, the article read in full as follows:

> A new group which will work against the rights and interests of classroom teachers was recently formed. The North Carolina Association of School Administrators, led by Frank Yeager, has joined forces with the North Carolina School Boards Association and the PTA to lobby legislators in opposition to fair employment and dismissal procedures, the new salary schedule for teachers, and any efforts by teachers to obtain a significant role in policy formation.
>
> Yeager and Gene Causby, executive director of the School Boards Association and outspoken foe of classroom teachers, have consistently resisted attempts by teachers to have a meaningful part in improving the educational environment. Jim Bell, state ACT president, questioned PTA's involvement in an alliance whose stated goals are against the interest of

classroom teachers. 'I thought the "T" stood for teachers," he said. 'If the PTA chooses to take a position against teachers, then perhaps we need to reconsider our participation in that organization.'

23. At the time Toggerson prepared the article she believed the statements therein to be true. She based the article primarily on information contained in the newsletter of the state NCAE organization, with which the Durham County ACT maintained an association. Toggerson, who holds a master's degree in journalism, made no effort to verify the information contained in the NCAE newsletter, including contacting Superintendent Yeager to confirm it.

24. At a meeting with teacher representatives from each of the schools in the Durham County system on March 5, 1981, Superintendent Yeager was for the first time shown a copy of Toggerson's article by a concerned teacher. Shocked by what he perceived as gross inaccuracies in it, he stated to the approximately twenty teachers present either that the article was a lie or that Toggerson was a liar in the context of the article. (Evidence at trial did not establish his precise statement.) He then explained his policies and those of the Alliance.

25. The following day, March 6, 1981, Yeager sent a letter to Toggerson regarding her article. After indicating how the article came to his attention, he stated:

> I respect everyone's fundamental right to 'freedom of speech,' but with that right comes a responsibility for truth and honesty. Your article is neither factually true nor honest, and it undermines my working relationship with teachers of the Durham County Schools. As a teacher of this school system, you have a professional responsibility that is now also in question. Because of your malicious discrediting of me, another professional, some staff might be unnecessarily threatened. You didn't even make an effort to check your facts.

He went on to set forth various positions of the Alliance and invited Toggerson to provide an explanation for her distribution of

this "erroneous information." She has never responded. Copies of the letter were sent to each member of the Board of Education, Toggerson's principal, the head of the Durham County ACT, and the editor of *Chalk Talk.* A copy was also sent to the assistant superintendent of personnel for placement in Toggerson's personnel file, which, after consultation with the school system counsel, Yeager believed was required under N.C.Gen.Stat. § 115C–325(b).

26. At the time Yeager wrote the letter and subsequently, he believed that Toggerson's article posed a serious threat to his relationship with the approximately 1,200 teachers in the Durham County system, particularly since his infrequent contacts with teachers during the school year prevented them from knowing him personally. He felt that teacher trust in him, as the chief administrative officer and as an officer with substantial responsibility for teacher discipline, was critical to the efficient operation of the school system.

27. The letter from Yeager, its distribution to various third parties, and its placement in Toggerson's personnel file have reduced Toggerson's willingness to criticize the school system for fear of retaliation. She has nevertheless filed two grievances against the administration after the events relating to her article.

28. A short time after Yeager sent his letter to Toggerson (no specific date was established at trial), a principal at an elementary school in the Durham County system notified Yeager of teacher complaints and anger over the positions of the Alliance and Yeager as portrayed in Toggerson's article, particularly in connection with use of their parent-teacher association dues to support the Alliance. Yeager felt it necessary to meet with the teachers for approximately an hour to discuss the article, although their concerns had not resulted in a disruption of regular classroom activities. After receiving telephone calls from three or four other principals concerning the article, Yeager held a meeting with all principals in the school system to discuss it. In addition, Yeager arranged for publication of a refutation of the Toggerson article in the April 9, 1981, issue of *Inform,* a newsletter sent by the school system to all of its employees. He also had a letter sent by the school system public affairs officer to *Chalk Talk* concerning the article. A later issue of *Chalk Talk* presented an interview with Yeager which touched on issues raised by the Toggerson article. Yeager continued to receive inquiries concerning the Toggerson article for approximately a year after its publication.

29. On November 4, 1981, Toggerson brought the instant action along with her co-Plaintiffs against Defendants.

### D. *Plaintiff Durham County Chapter of the NCAE's Claim*

30. The placement of the administrators' letters in Gregory's and Toggerson's personnel files has reduced the willingness of some other teacher members of the NCAE to criticize the school system administration for fear of retaliation.

31. On November 4, 1981, the Durham County ACT[1] brought the instant action along with its co-Plaintiffs against Defendants as representative of its members.

### CONCLUSIONS OF LAW

#### A. *Jurisdiction*

1. This court has jurisdiction over Plaintiffs' constitutional claims, brought under 42 U.S.C. § 1983, pursuant to 28 U.S.C. §§ 1331 & 1343(a)(3).

2. In its discretion the court shall also exercise jurisdiction over Gregory's contract claim and Toggerson's libel and slander claim pursuant to the doctrine of pendent jurisdiction, the court finding that there exists "a common nucleus of operative fact" between these claims and the constitutional claims. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

---

1. As indicated *supra,* this organization was subsequently absorbed into the Durham County Chapter of the NCAE, whose name has been substituted in the complaint.

## B. *Plaintiffs' Constitutional Claims*

■ 3. Each Plaintiff makes separate constitutional claims. Gregory contends that the placement of Wasdell's August 4, 1980, letter in her personnel file was in retaliation for her criticism of the school system administration's decisions on scheduling of the Program workshops, pursuit of her grievance, and consultation with an attorney regarding it, and that the presence of the letter in her file has damaged her professional reputation, reduced her opportunities for alternative employment, and chilled her willingness to criticize the administration, all in violation of her first amendment right to freedom of speech. In her post-trial brief she claims for the first time that the alleged retaliation for pursuit of her grievance also violates her first amendment right of petition. Toggerson claims violations of her first amendment free-speech rights similar to those alleged by Gregory as a result of the placement [2] in her personnel file of Superintendent Yeager's letter of March 6, 1981, in purported retaliation for her February 1981 article in *Chalk Talk*. The Durham County Chapter of the NCAE claims that the first amend-

ment rights to free speech of its teacher members have been chilled by the action taken against Gregory and Toggerson.[3] In response Defendants contend that the letters were placed in the teachers' files pursuant to the requirements of N.C.Gen.Stat. § 115C–325(b), not in retaliation for the teachers' actions or for the purpose of chilling their speech, and that the presence of the letters has in no way chilled or otherwise injured them or other teachers.

4. Plaintiffs' free-speech claims are controlled by principles laid down in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and its progeny. These principles will also be considered on Gregory's right of petition claim.[4] *Pickering* requires courts to seek "a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1734. The burden rests on the government to convince the court that the balance tips in favor of its interest. *Jones*

---

**2.** For purposes of this opinion, placement of the Wasdell and Yeager letters in the teachers' respective files is deemed to include the writing of these letters, which Gregory and Toggerson claim constitutes a distinct violation of their constitutional rights.

**3.** Both Wasdell's August 4, 1980, letter and Yeager's March 6, 1981, letter are now subject to a provision of North Carolina law barring their use as a *basis* for dismissal or demotion because they relate to events occurring more than three years ago. *See* N.C.Gen.Stat. § 115C–325(e)(4). Nevertheless, the continuing availability of the letters for use as *background* for their dismissal or demotion, *see Baxter v. Poe,* 42 N.C.App. 404, 410, 257 S.E.2d 71, 75, *cert. denied,* 298 N.C. 293, 259 S.E.2d 298 (1979), and in the promotion of each teacher, among other considerations, precludes a determination that Plaintiffs' claims have become moot.

**4.** In so doing, the court does not decide whether the *Pickering* test is controlling over Gregory's right of petition claim, *cf. Renfroe v. Kirkpatrick,* 722 F.2d 714 (11th Cir.1984) (*Pickering* test applied to alleged retaliation against government employee for pursuit of grievance although employee's right of petition not expressly addressed); *Knapp v. Whitaker,* 577 F.Supp.

1265 (C.D.Ill.1983) (same); *Mahaffey v. Kansas Bd. of Regents,* 562 F.Supp. 887 (D.Kan.1983) (same), rather than the compelling interest test, as Gregory contends citing, *e.g., United Mine Workers v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967); *Bradley v. Computer Sciences Corp.,* 643 F.2d 1029, 1033 (4th Cir.), *cert. denied,* 454 U.S. 940, 102 S.Ct. 476, 70 L.Ed.2d 248 (1981); *see also Henrico Prof. Firefighters Ass'n, Local 1568 v. Board of Supervisors,* 649 F.2d 237, 243 (4th Cir.1981). The court finds no need to decide this issue because the claim cannot succeed under either test. Under the *Pickering* test, it fails because Gregory's grievance relates to matters of personal, not public, concern, as discussed *infra*. Under the compelling interest test, the claim fails because the government's substantial interest in maintaining discipline among its employees, coupled with the court's finding *infra* that the action against Gregory was not in retaliation for her grievance, justifies any minimal, incidental infringement of her right of petition which may have occurred. *Cf. United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 564, 93 S.Ct. 2880, 2890, 37 L.Ed.2d 796 (1973) (government's interest in efficient provision of public services justifies limited restrictions on political activities of government employees).

*v. Dodson,* 727 F.2d 1329, 1334 (4th Cir. 1984). Although the *Pickering* case involved the discharge of an employee, the test enunciated in it is equally applicable to less severe personnel action such as that involved here. *See id.* at 1334 n. 5; *see also Swilley v. Alexander,* 629 F.2d 1018 (5th Cir.1980) (letter of reprimand in personnel file); *Columbus Education Association v. Columbus City School District,* 623 F.2d 1155 (6th Cir.1980) (letter of reprimand in personnel file); *Yoggerst v. Stewart,* 623 F.2d 35 (7th Cir.1980) (oral reprimand and written reprimand in personnel file).

5. A threshold issue under the *Pickering* test is whether the employee's speech is a matter of "legitimate public concern ... [upon which] free and open debate is vital to informed decision-making by the electorate." *Pickering v. Board of Education,* 391 U.S. at 571–72, 88 S.Ct. at 1736–37. If expression by an employee does not relate to "any matter of political, social, or other concern to the community," the overriding interest of the government employer in operating without intrusive judicial oversight dictates that the employee's claim be denied outright without courts proceeding further to actually balancing the government's and employee's interests. *Connick v. Myers,* 461 U.S. 138, ——, 103 S.Ct. 1684, 1689–90, 75 L.Ed.2d 708 (1983). Whether an employee's speech does address a matter of public concern is to be determined from its "content, form, and context," taking into account all relevant facts. *Id.,* 461 U.S. at ——, 103 S.Ct. at 1690.

■ 6. Applying the *Pickering* test to Gregory's claim, it is readily apparent that her conduct fails to pass this threshold requirement. The subject matter of Gregory's criticism of the administration and of her grievance against it, which the court believes was brought on her behalf alone, was, in essence, the rescheduling of a mandatory training program in order to avoid a conflict with her vacation plans and the need to work longer than usual hours on four days. Such issues are quintessentially matters of personal concern tied to a personal employment dispute. *See Connick v. Myers,* 461 U.S. at ——, 103 S.Ct. at 1690–91; *Renfroe v. Kirkpatrick,* 722 F.2d 714, 715 (11th Cir.1984). "[A] federal court is not the appropriate forum in which to review the wisdom of a personnel decision" regarding such personal concerns. *Connick v. Myers,* 461 U.S. at ——, 103 S.Ct. at 1690. Judgment will accordingly be entered for Defendants on this claim by Gregory.

■ 7. The orientation of Toggerson's article is also toward personal employment concerns. Although the issues it addresses are of some legitimate interest to the public, they also have a very significant impact on Toggerson herself as a teacher. These include whether the Superintendent actively opposes fair employment and dismissal procedures for teachers, increased teachers' salaries, and efforts by teachers to obtain a meaningful role in policy formation. Moreover, the article was not sent to the public generally but only to teachers in the Durham County system. Because the article bears only an attenuated relationship to the public and its concerns, the first amendment interest of Toggerson in it is limited. *Connick v. Myers,* 461 U.S. at ——, 103 S.Ct. at 1393–94; *Jones v. Dodson,* 727 F.2d at 1334. Toggerson did not forfeit this limited interest by publishing the article with knowledge that it was false or with reckless disregard of the truth, *see Pickering v. Board of Education,* 391 U.S. at 574 & n. 6, 88 S.Ct. at 1738 & n. 6, the court having found that she believed her assertions to be true when made, *see Time, Inc. v. Pape,* 401 U.S. 279, 291–92, 91 S.Ct. 633, 640–41, 28 L.Ed.2d 45 (1971) (recklessness requires that speaker doubt truth of statements when made).

8. The court must now undertake the actual balancing of Toggerson's free-speech interest and her employer's administrative interest, as prescribed by *Pickering.* The concern here is weighing the degree of public interest in the particular expression by Toggerson against the degree to which her conduct was justifiably viewed by Yeager, acting on behalf of the

Board of Education, as an actual or potential disruption of the operations for which the Board is responsible. *Jones v. Dodson*, 727 F.2d at 1334. Stated generally, the factors to be taken into consideration include: whether the employee's personal employment situation is substantially involved in the subject matter of his speech, *Cooper v. Johnson*, 590 F.2d 559, 561 (4th Cir.1979); whether the employee's speech would tend to harm the professional reputation of its target, *id.;* whether the employee's speech would tend to undermine working relationships essential to the efficient operation of the governmental activity involved, *see Connick v. Myers*, 461 U.S. at ——, 103 S.Ct. at 1692; and whether the personnel actions being challenged would tend to chill the employee's exercise of his free-speech rights, *see Yoggerst v. Stewart*, 623 F.2d at 39.

9. Looking first at the disruptive potential posed by the article, the court finds that Yeager reasonably believed it threatened the efficient operation of the Durham County system by undermining his relationship with teachers. The efficiency of the Durham County system depends on teacher trust in the Superintendent, because of his role, second only to that of the Board of Education, in setting policies that affect teachers, selecting personnel who directly supervise them, and in meting out teacher discipline. It is true as *Pickering*, 391 U.S. at 570, 88 S.Ct. at 1735, and other decisions have noted that a superintendent's relationship with teachers does not involve the type of close day-to-day interaction that by its very intimacy limits the realm for employee criticism. Instead, the relationship is vulnerable, at least here, precisely because of the superintendent's relative isolation from teachers, which prevents them from knowing him personally and compels them to rely on such means as newsletters for information concerning his policies.

10. Toggerson's article threatened Yeager's relationship with teachers in part because of the gravity of her allegations against him: that he was not merely opposed to, but actively working against, the interests of teachers with regard to salaries, their role in decision-making, and tenure, all among the most critical areas of teacher employment. Moreover, these charges were presented as facts, not merely Toggerson's personal opinions. At trial, Toggerson in effect acknowledged that they were opinions, providing lengthy rationales for them. No such sobering acknowledgment or explanations, however, appeared in the article. The population to which the allegations were directed tended to maximize their disruptive potential; as indicated *supra*, they were sent as part of the regular Durham County ACT newsletter to approximately one of every two teachers in the Durham County system.

11. Subsequent events substantiated the reality of the threat the article posed. These included: Yeager's being confronted with the article by a teacher at the March 5, 1981, meeting of teacher representatives; anger and frustration over the allegations on the part of a significant proportion of the teachers at an elementary school who obviously believed them to be true, their concerns judged by the school principal to be sufficiently serious to be reported to the Superintendent; and reports to the Superintendent from several other principals concerned over the effect of the article. The absence of evidence of actual widespread disruption of the school system does not negate the danger posed by Toggerson's article. There is no "necessity for an employer to allow events to unfold to the extent that the disruption of ... [operations] and the destruction of working relationships is manifest before taking action." *Connick v. Myers*, 461 U.S. at ——, 103 S.Ct. at 1692. The prompt measures taken by Yeager, including his explanation of the article at the meeting of teacher representatives, his meeting with troubled teachers at the elementary school, and his meeting with principals, followed by publication of his views in the newsletters *Inform* and *Chalk Talk* and other remedial actions, undoubtedly did much to foreclose disruptions that otherwise could have occurred.

12. Turning now to the impact of Yeager's letter on Toggerson, the court finds that it did have a chilling effect on her, but that this effect was minimal. The weight of authority supports the proposition that placement of a letter of reprimand (even if not denominated as such as in this case) in an employee's personnel file generally does have a chilling effect on the employee, *see, e.g., Columbus Education Association v. Columbus City School District,* 623 F.2d at 1159, although the degree of chill is as a rule less than that associated with more drastic personnel actions, such as dismissal. This chilling effect tends to be minimized here at the outset because placement of the letter in Toggerson's file was not a sanction arbitrarily imposed by Yeager. Rather, it was as Yeager believed a requirement of the law applicable to every teacher. *See* N.C.Gen.Stat. § 115C–325(b); 41 N.C.Att'y Gen. 782 (1972).

13. The chilling effect is further tempered by numerous restrictions under North Carolina law and school system practice and procedure required by law that limit the use of a teacher's personnel file in the Durham County system. Only Toggerson, members of the Board of Education, Superintendent Yeager, and certain other interested administrative personnel are permitted access to her file. The reputation of Toggerson within the school system is thereby safeguarded. In addition, the file may not be made available to officials in other school systems, protecting the ability of Toggerson to seek employment outside Durham County. Although a personnel file may be consulted with regard to disciplinary matters, information in it regarding conduct occurring more than three years prior may not serve as a basis for a dismissal or demotion but only as background for such action. *Baxter v. Poe,* 42 N.C. App. 404, 410, 257 S.E.2d 71, 75, *cert. denied,* 298 N.C. 293, 259 S.E.2d 298 (1979) (interpreting statute now codified at N.C. Gen.Stat. § 115C–325[e][4] ). This restriction now applies to Yeager's letter. No evidence was presented at trial indicating that any of these various restrictions has been violated. Perhaps most importantly,

Toggerson has the right to respond to Yeager's letter and to have her response placed in her file. N.C.Gen.Stat. § 115C–325(b). Through such a response, Toggerson could provide information enabling a person reading her file to make an independent judgment on her article. Among other salutary effects, she could thereby help eliminate any deference given Yeager's criticism simply because of the position he holds. Toggerson has chosen not to exercise this right.

14. With regard to Yeager's letter itself, the criticisms he makes of Toggerson's article are limited in scope and severity. Most of the critical content of the letter consists of simple denials that the allegations in the article are true (*e.g.,* "[y]our article is ... [not] factually true") and factual statements relating to the preparation or impact of the article (*e.g.,* "it undermines my working relationship with teachers," "[y]ou didn't even make an effort to check your facts"). Yeager does challenge Toggerson's good faith and honesty in writing the article (*e.g.,* "malicious discrediting of me"), but this charge does not relate directly to her competence as a teacher. There is, in fact, only one criticism that does (*i.e.,* "you have a professional responsibility that is now also in question") and it is relatively mild, not even stating definitely that a violation of professional standards has occurred. Moreover, Yeager presents factual information on the subject matter of the article, in an effort to support his denials, that helps the reader make an independent judgment on their merit.

15. In view of the threat of disruption posed by Toggerson's article, the court cannot say that Yeager's letter, its use restricted and language restrained as it was, impermissibly infringed Toggerson's limited first amendment interest in the article. The fact that Toggerson has brought two grievances against the administration since Yeager's letter was placed in her file reinforces this conclusion. Judgment will therefore be entered for Defendants on her constitutional claim. Because neither of

the teacher Plaintiffs has valid constitutional claims against Defendants, the claim against them by the Durham County Chapter of the NCAE as representative of its teacher members must also fail. *See Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975); *accord Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378–79, 102 S.Ct. 1114, 1124–25, 71 L.Ed.2d 214 (1982) (suit brought by member organization on its own behalf).

16. In denying Plaintiffs' constitutional claims, the court emphasizes the limited role the judiciary must play in deciding such matters. Federal courts do not pass on the wisdom of the personnel actions challenged or even their fundamental fairness. Rather, the need to preserve the independence of public management and scarce judicial resources, among other considerations, restricts the courts' inquiry to whether the personnel actions qualify under stringent tests promulgated by the Supreme Court as constitutional violations. As the Supreme Court itself has noted:

> The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error.

*Bishop v. Wood,* 426 U.S. 341, 349–50, 96 S.Ct. 2074, 2079–80, 48 L.Ed.2d 684 (1976).

### C. *Plaintiffs' Pendent Claims*

■ 17. Plaintiffs' state law claims are dealt with readily. Gregory claims that the placement of Wasdell's letter of August 4, 1980, in her personnel file and the other action taken against her in connection with the rescheduling of the Program workshops were undertaken in retaliation for her pursuing a grievance on the matter in violation of the school system's grievance procedure, allegedly a part of her employment contract. The claim is without merit. The overwhelming evidence indicates that Wasdell and the other administrators involved took these measures in response to what they considered the gross insubordination evidenced by Gregory's letter of July 31, 1980. The disparately favorable treatment accorded another teacher is adequately explained by differences between the language in her letter and Gregory's. Judgment will therefore be entered for Defendants on this claim.

■ 18. Toggerson's claim is that the oral statements by Yeager at the March 5, 1981, meeting of teacher representatives to the effect that she lied in her article and related statements in his March 6, 1981, letter to her constituted slander and libel, respectively. The claim will be denied. Toggerson's article infringed legally cognizable interests of Yeager as Superintendent which he had a qualified privilege under law to protect. *Goforth v. Avemco Life Insurance Co.,* 368 F.2d 25, 31 (4th Cir.1966) (applying North Carolina law); *R.H. Bouligny, Inc. v. United Steelworkers,* 270 N.C. 160, 172, 154 S.E.2d 344, 355 (1967); *see generally* W. Prosser, *Law of Torts* § 115, at 789–91 (4th ed. 1971). He also enjoyed a personal privilege of self-defense. *See Ivie v. King,* 167 N.C. 174, 177–78, 83 S.E. 339, 340 (1914), *aff'd on rehearing,* 169 N.C. 261, 85 S.E. 413 (1915); *Restatement (Second) of Torts* § 594 & comments f & k (1976); *see generally* W. Prosser, *supra,* at 786–87. His statements at the meeting of teacher representatives and in his letter were reasonably limited to defense of his interests. *See R.H. Bouligny, Inc. v. United Steelworkers,* 270 N.C. at 172, 154 S.E.2d at 355; *Ivie v. King,* 167 N.C. at 178, 83 S.E. at 340; *Restatement (Second) of Torts* § 594 comment k (1976) (defendant's rebuttal may include statement that accuser is an "unmitigated liar"). The persons to whom the statements were addressed had sufficient legitimate interest in their content to preclude Yeager's waiver of the privilege through excessive publication. *See Stewart v. Nation-Wide Check Corp.,* 279 N.C. 278, 285, 182 S.E.2d 410, 415 (1971); *Alpar v. Weyerhaeuser Co.,* 20 N.C.App. 340, 343 & 346, 201 S.E.2d 503, 506 & 508, *cert. denied,* 285 N.C. 85, 203

S.E.2d 57 (1974). There was also no waiver through malice since Yeager was clearly acting in good faith to protect his interests. *See Goforth v. Avemco Life Insurance Co.*, 368 F.2d at 31; *R.H. Bouligny, Inc. v. United Steelworkers*, 270 N.C. at 173, 154 S.E.2d at 355–56. The motion of Defendant Yeager to dismiss will therefore be granted and judgment entered for him on this claim.

The court will enter a judgment simultaneously herewith disposing of this case in accordance with this memorandum opinion.